```
                IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF FLORIDA
                  CASE NO. 22-14026-CR-CANNON


UNITED STATES OF AMERICA,

                   Plaintiff,              NOVEMBER 17, 2022

         vs.
                                           FORT PIERCE, FLORIDA
ARTAVIS SPIVEY,

                   Defendant.              Pages 1 - 96
_____/



                 TRANSCRIPT OF SENTENCING HEARING
              BEFORE THE HONORABLE AILEEN CANNON
                  UNITED STATES DISTRICT JUDGE



APPEARANCES:

FOR THE PLAINTIFF:       MICHAEL PORTER, AUSA
                         Office of U.S. Attorney
                         101 South US Highway One
                         Suite 3100
                         Fort Pierce, Florida  34950




FOR THE DEFENDANT:       VALENTIN RODRIGUEZ, ESQ.
                         2465 Mercer Avenue
                         Suite 301
                         West Palm Beach, Florida  33401






REPORTED BY:             DIANE MILLER, RMR, CRR
                         Official Court Reporter
                         (772)467-2337
                         diane_miller@flsd.uscourts.gov's
```

INDEX OF WITNESSES

WITNESS                                          PAGE

Daniel Zamot

    Direct by Mr. Porter                    6

    Cross by Mr. Rodriguez                 23

    Redirect by Mr. Porter                 36

Clara Flores

    Direct by Mr. Porter                   40

ARTAVIS SPIVEY

    Direct by Mr. Rodriguez                57

Thursday, November 17, 2022.

<u>P-R-O-C-E-E-D-I-N-G-S</u>

1

2          THE COURT:  Thank you.  Please call the case.

3          THE COURTROOM DEPUTY:  Calling case

4  22-CR-14026-Cannon, the United States v. Artavis Spivey.

5          Counsel, can you please state your appearance,

6  starting with the Government.

7          MR. PORTER:  Good morning, Your Honor; Michael Porter

8  on behalf of the United States.

9          THE COURT:  Good morning.

10          MR. RODRIGUEZ:  Good morning, Your Honor; Valentin

11  Rodriguez on behalf of the defendant.

12          THE COURT:  Good morning, Mr. Rodriguez.

13          And good morning, Mr. Spivey.

14          Who is here for Probation?

15          PROBATION OFFICER:  Good morning, Your Honor; Nathan

16  Vreeland, U.S. Probation.

17          THE COURT:  Good morning, Mr. Vreeland.

18          All right.  We're here for sentencing in this matter.

19  We have allotted some additional time for this sentencing as

20  well as the next one.

21          Mr. Spivey, the record reflects that you pled guilty

22  to counts one and two of the indictment.  Count one charges you

23  with carjacking in violation of Title 18, United States Code,

24  Section 2119 subsection (1), and Title 18, United States Code,

25  Section 2; and count two of the indictment charges you with

1    brandishing a firearm during and in relation to a crime of

2    violence in violation of Title 18, United States Code,

3    Section 924(c)(1)(A)(ii), and Title 18, United States Code,

4    Section 2.  So you have been adjudicated guilty of those two

5    offenses, sir, as we are now at your sentencing hearing.

6          I have reviewed the full record in anticipation of

7    today's hearing including, of course, the Presentence

8    Investigation Report, the Defense objections to that report,

9    the Government's response to those objections, the addendum to

10   the PSI, as well as the plea agreement and the factual proffer.

11         Mr. Rodriguez, are there any other materials the

12   Court should have considered in anticipation of today's

13   hearing?

14         MR. RODRIGUEZ:  None that I know of, Your Honor.

15         THE COURT:  All right.  Well, then, let's get

16   started.

17         Mr. Porter, do you have an anticipated plan for any

18   evidence presentation this morning?

19         MR. PORTER:  I do, Your Honor.  The United States

20   intends to call the codefendant in this case, Daniel Zamot, and

21   I have a few exhibits that I intend to introduce through

22   Mr. Zamot.  I provided Your Honor with some of those --

23   actually, I provided Your Honor with all of those and an

24   exhibit list on top of it.  I've also provided Mr. Rodriguez

25   with a copy of that.  And I also intend to call Clara Flores,

```
 1   who is Mr. Zamot's mother.
 2              THE COURT:  Okay.
 3              All right.  Now, before we get started, I do want to
 4   inquire.  Are there any victims present in the courtroom who
 5   wish to be heard?
 6              MR. PORTER:  Yes, Your Honor.  The victim of this
 7   offense, Jennifer Shiflet, is here, and at the appropriate
 8   time, she would like to elocute.
 9              THE COURT:  All right.  Thank you.  We will certainly
10   provide that opportunity for her.
11              All right.  Well, then, let's turn to the PSI and
12   focus in on the remaining objections.
13              Mr. Rodriguez, what are the currently unresolved
14   objections to the PSI?
15              MR. RODRIGUEZ:  Yes, Your Honor.
16              The first one is obstruction of justice, the
17   enhancement -- let me give you the exact paragraph, Your
18   Honor -- it would be paragraph 32, a two-level increase -- yes,
19   two-level increase.
20              THE COURT:  Mr. Rodriguez, you're trailing off a
21   little bit with your mic.
22              MR. RODRIGUEZ:  Thank you.
23              Yes, it would be paragraph 32 which contains a
24   two-level increase under U.S.S.G. 3C1.1, as well as the denial
25   of acceptance of responsibility, which would be in
```

```
 1   paragraph 36.
 2            THE COURT:  All right.  Well, then, let's turn first
 3   to the obstruction enhancement.
 4            Mr. Porter, is this the point at which you wish to
 5   introduce any evidence?
 6            MR. PORTER:  It is, Your Honor.
 7            THE COURT:  All right.  Well, let's do that then.
 8   Please call your first witness in support of this enhancement.
 9            MR. PORTER:  The United States calls Daniel Zamot.
10            THE COURT:  Good morning, sir.  If you could please
11   walk over to the witness stand.
12            Please remain standing to be sworn in and remove your
13   mask.
14            THE COURTROOM DEPUTY:  Please raise your right hand.
15       DANIEL ZAMOT, GOVERNMENT WITNESS, WAS SWORN
16            THE COURTROOM DEPUTY:  Please have a seat.
17            Please state your full name for the record and spell
18   your last name.
19            THE WITNESS:  Daniel Zamot, Z-A-M-O-T.
20                      DIRECT EXAMINATION
21   BY MR. PORTER:
22   Q.  Good morning, Mr. Zamot.
23   A.  Good morning.
24   Q.  Are you able to see and hear me?
25   A.  Yes.
```

1    Q.  I see that you're in handcuffs.  Are you currently

2    incarcerated?

3    A.  Yes.

4    Q.  What charges are you incarcerated for?

5    A.  Armed carjacking.

6    Q.  Were you arrested for those charges back in February 17th

7    of 2022?

8    A.  Yes, sir.

9    Q.  Have you been in custody since then?

10   A.  Yes, sir.

11   Q.  What is the status of those charges, the armed carjacking

12   charges?

13   A.  Pled guilty and I'm waiting to be sentenced.

14   Q.  Did you enter into a plea agreement with the United States

15   in this case?

16   A.  Yes, sir.

17   Q.  As part of that plea agreement, did you agree to cooperate

18   with the United States?

19   A.  Yes, sir.

20   Q.  Has anybody made any promises to you in exchange for your

21   cooperation?

22   A.  No, sir.

23   Q.  Do you know a man named Artavis Spivey?

24   A.  Yes, sir.

25   Q.  How do you know Mr. Spivey?

```
1   A.   Met him at the basketball court.

2   Q.   When did you meet him at the basketball court?

3   A.   Five days prior to when the carjacking took place.

4   Q.   So about five days prior to the carjacking.

5   A.   Yeah.

6   Q.   Tell us about that meeting that you had with Mr. Spivey at

7   the basketball court.

8   A.   He asked me to join a gang, and I declined and so --

9   Q.   Do you know if Mr. Spivey had any firearms with him when

10  you met him at the basketball court?

11  A.   Yes, sir.

12  Q.   Tell us about what firearm you saw Mr. Spivey with when you

13  first met him.

14  A.   It was a black firearm with an extended clip.

15  Q.   Now I want you to walk me through what happened the day of

16  the carjacking.

17  A.   I took a shower, got dressed, and -- I got dressed and I

18  got a call from Spivey, and he came to my house, and we was

19  walking, we was smoking and decided to do a carjacking.

20  Q.   You said "decided to do a carjacking," explain for us how

21  you came to that conclusion, the decision to do a carjacking.

22  A.   He wanted to go to Fort Myers to go pick up a friend and

23  decided to steal a car.

24  Q.   What did he say to you?

25  A.   Basically, he told me to take the car and if I don't do it,
```

```
 1   that he was gonna hurt my family.
 2   Q.  Did you believe him?
 3   A.  Yes.
 4   Q.  When he said that to you, did it scare you?
 5   A.  Yeah.
 6   Q.  Did he have a firearm with him on that day?
 7   A.  Yes, sir.
 8   Q.  Can you describe that firearm for us?
 9   A.  Black with a long clip, extended clip.
10   Q.  Is it the same firearm that you saw him with at the
11   basketball court?
12   A.  Yes, sir.
13   Q.  Mr. Zamot, have you ever been shot before?
14   A.  Yes, sir.
15   Q.  Can you tell us about that?
16   A.  What you mean?
17   Q.  When you were shot.
18   A.  It was -- I don't know how to explain it.  It was just
19   crazy.
20   Q.  Where did it happen?
21   A.  In my apartment.
22   Q.  Did somebody shoot you?
23   A.  Yes, sir.
24   Q.  How old were you?
25   A.  Sixteen.
```

1   Q.   How many times did they shoot you?

2   A.   Six times.

3   Q.   Did you have to go to the hospital?

4   A.   Yes, sir.

5   Q.   Did you have to have surgery?

6   A.   Yes, sir.

7   Q.   How did that event make you feel about being around

8   firearms?

9   A.   I would just look at a gun and just be, like, that little

10   object almost killed me.

11   Q.   So tell me what happened after you had that conversation

12   with Artavis Spivey where he told you about doing a carjacking.

13   What did you do and what did he do after that?

14   A.   So basically, we walk, and he spotted a white car that had

15   an open door, and he walked up to the vehicle and pulled his

16   firearm out and took the car from the lady and asked for her

17   keys and her phone and money, and she said she didn't have any

18   money.

19   Q.   What did you do when this was happening?

20   A.   I just standing there.

21   Q.   Why didn't you say "no" to Artavis Spivey?

22   A.   Because he threatened to hurt my family.

23   Q.   What happened after you and Artavis Spivey stole that car?

24   A.   Drove it all the way to Fort Myers.

25   Q.   Did you ultimately end up crashing the vehicle while you

1   were being pursued by law enforcement?

2   A.  Yes, sir.

3   Q.  You were in the passenger seat, Artavis Spivey was driving

4   the vehicle?

5   A.  Yes, sir.

6   Q.  Mr. Zamot, you're currently incarcerated.  Where are you

7   being housed at?  What jail are you at?

8   A.  Palm Beach County jail.

9   Q.  Prior to be being at the Palm Beach County jail were you at

10  another facility?

11  A.  Yes, sir.

12  Q.  Where were you?

13  A.  At Fort Pierce.

14  Q.  The St. Lucie County jail?

15  A.  St. Lucie County jail.

16  Q.  Were you transferred from the St. Lucie County jail to the

17  Palm Beach County jail?

18  A.  Yes, sir.

19  Q.  Why were you transferred from the St. Lucie County jail to

20  the Palm Beach County jail?

21  A.  Because I called my mom and told her to contact my lawyer

22  and tell her that I was in the dorm with Spivey.

23  Q.  Did something happen when you were in the dorm with Artavis

24  Spivey at the St. Lucie County jail?

25  A.  Yes, sir.

1   Q.  Tell us what happened.

2   A.  When he first got in the dorm, we had seen each other, and

3   we got into an altercation and after the altercation, he made

4   me write a letter.

5   Q.  You say that he made you write a letter.  What did he tell

6   you that caused you to write that letter?

7   A.  He threatened to hurt my family and he said that still

8   chaining trap boy ready to crash.

9   Q.  Now, for us that may not make a lot of sense.  Can you

10  explain what that meant to you?

11  A.  That he was gonna hurt my family.

12  Q.  Did you, in fact, write a letter at Artavis Spivey's

13  direction?

14  A.  Say it again?

15  Q.  Did you ultimately write a letter?

16  A.  Yes, sir.

17  Q.  Did Artavis Spivey tell you to write that letter?

18  A.  Yes, sir.

19  Q.  Mr. Zamot, at this time, I'm going to show you an exhibit,

20  and I want you to take a minute and look at it, and then let me

21  know if you recognize it.

22          It's going to appear on the screen right in front of

23  you.

24          MR. PORTER:  At this time, the United States is --

25  Judge, permission to show the witness Government's Exhibit

```
 1   Number 1.
 2              THE COURT:  Any objection?
 3              MR. RODRIGUEZ:  No, Your Honor.
 4              THE COURT:  Permission granted.
 5   BY MR. PORTER:
 6   Q.  Mr. Zamot, do you recognize this document?
 7   A.  Yes, sir.
 8   Q.  Is this the first page of a letter you wrote?
 9   A.  Yes, sir.
10              (Evidence identified as Government Exhibit No. 1)
11   BY MR. PORTER:
12   Q.  Is that your handwriting?
13   A.  Yes, sir.
14   Q.  Now I'm going to show you the second page of the letter.
15              Again, is that the letter that you wrote?
16   A.  Yes, sir.
17   Q.  Down at the bottom where it says "respectfully submitted by
18   Daniel Zamot," did you write that?
19   A.  Yes, sir.
20   Q.  Daniel, I want you to take a minute and read this letter
21   and then I'm going to ask you some questions about it, okay?
22   A.  Yes, sir.
23   Q.  Just take a minute and let me know when you're finished.
24              (Brief pause in proceedings)
25   A.  I'm done.
```

```
 1   Q.  Mr. Zamot, the statements that are in this letter, are they

 2   true?

 3   A.  No, sir.

 4   Q.  Why did you write them?

 5   A.  Because my family was threatened.

 6   Q.  When Artavis Spivey threatened your family, did you believe

 7   him?

 8   A.  Yes, sir.

 9   Q.  Why did you believe him?

10   A.  Because he has a lot of people in Avon Park that's

11   dangerous.

12   Q.  What did Artavis Spivey tell you to do with this letter

13   after you wrote it?

14   A.  Send it to the clerk of court.

15   Q.  And at the top of the letter, there's actually a case

16   number on there, and the judges who are assigned to the case

17   are also listed on there, correct?

18   A.  Yes, sir.

19   Q.  Who told you to write that at the top of the letter?

20   A.  This dude named "Green" in the dorm that I was in, in

21   Fort -- St. Lucie.

22   Q.  Tell us about this dude named "Green."  Who is he?

23   A.  A jail lawyer.

24   Q.  Was he there when you were writing this letter?

25   A.  Yes, sir.
```

```
 1   Q.  Was he helping Artavis Spivey tell you what to put in the
 2   letter?
 3   A.  Yes, sir.
 4   Q.  Was Artavis Spivey also there when you were writing this
 5   letter?
 6   A.  Yes, sir.
 7   Q.  So Artavis Spivey told you to send the letter to the clerk
 8   of court.
 9   A.  Yes, sir.
10   Q.  Did you send it to the clerk of court?
11   A.  No, sir.
12   Q.  Why not?
13   A.  Because the statement in the letter's not true.
14   Q.  When you were at the jail and you were threatened by Spivey
15   and when he told you to write this letter, did you tell anybody
16   at the jail right away?
17   A.  No, sir.
18   Q.  Why not?
19   A.  Because I didn't want to get it out to anybody.
20   Q.  Who did you tell?
21   A.  Told my lawyer.
22   Q.  How long did it take you to tell her?
23   A.  When she came to visit me.
24   Q.  Did you call anyone from the jail after this happened?
25   A.  Called my mom.
```

```
 1   Q.  What did you tell your mom?
 2   A.  If she could move, hurry up and move.
 3   Q.  Why did you tell her to do that?
 4   A.  Because I don't want my family to be harmed.
 5   Q.  Were you afraid that your family might be harmed?
 6   A.  Yes, sir.
 7   Q.  Did you also tell your mom to contact your lawyer?
 8   A.  Yes, sir.
 9   Q.  Was Artavis Spivey supposed to be in the same dorm as you?
10   A.  No, sir.
11   Q.  Mr. Zamot, I'm going to show you --
12           MR. PORTER:  Judge, at this time, the United States
13   moves Government's Exhibit 1 into evidence.
14           THE COURT:  Any objection?
15           MR. RODRIGUEZ:  No, Your Honor.
16           THE COURT:  Government's Exhibit 1 is admitted
17   without objection.
18           (Evidence admitted as Government Exhibit No. 1)
19   BY MR. PORTER:
20   Q.  Mr. Zamot, at this time, I'm going to show you some
21   photographs, and I want you to take a minute and look at each
22   one and then tell me if you recognize what is depicted in it.
23           MR. PORTER:  Judge, I'd ask permission from the Court
24   to show the witness Government's Exhibits 2, 3, 4, 5, and 6.  I
25   provided copies of all of those to Mr. Rodriguez, and I believe
```

1    Your Honor has a copy as well.

2              *(Evidence identified as Government Exhibit*

3              *Nos. 2, 3, 4, 5, and 5)*

4              THE COURT:  Any objection?

5              MR. RODRIGUEZ:  No, Your Honor.

6              THE COURT:  Permission granted.

7    BY MR. PORTER:

8    Q.  Mr. Zamot, do you recognize what is in this photograph?

9    A.  Yes, sir.

10   Q.  Can you describe it for us?

11   A.  I'm sitting in the chair writing a letter.

12   Q.  Are you sitting in the middle?

13   A.  Yes, sir.

14   Q.  Who is standing -- there's two men that are standing over

15   top of you.  Who are they?

16   A.  Green and Spivey.

17             MR. PORTER:  At this time, the United States moves

18   Government Exhibit Number 2 into evidence.

19             THE COURT:  Any objection?

20             MR. RODRIGUEZ:  No, Your Honor.

21             THE COURT:  Government 2 is admitted without

22   objection.

23             *(Evidence admitted as Government Exhibit No. 2)*

24   BY MR. PORTER:

25   Q.  Now I'm going to show you what's been marked as

```
 1  Government's Exhibit Number 3.  Can you tell us what this

 2  photograph shows?

 3  A.  Me standing up.

 4  Q.  Who is the man that is sitting down in front of you?

 5  A.  Spivey.

 6  Q.  And who is the man to the right of you?

 7  A.  Green.

 8  Q.  You're holding something in your hand.  What are you

 9  holding?

10  A.  The letter.

11          MR. PORTER:  Judge, the United States moves

12  Government's Exhibit Number 3 into evidence.

13          THE COURT:  Any objection to Government's 3?

14          MR. RODRIGUEZ:  No objection.

15          THE COURT:  Government's 3 is admitted without

16  objection.

17          (Evidence admitted as Government Exhibit No. 3)

18  BY MR. PORTER:

19  Q.  Mr. Zamot, now I'm showing you Government's Exhibit

20  Number 4.  Can you tell us what this photograph shows?

21  A.  Me writing a letter.

22  Q.  And there is a man sitting next to you.  Who is that man?

23  A.  Spivey.

24  Q.  Is that letter that you were writing in this photograph the

25  same letter that we just talked about?
```

1    A.  Yes, sir.

2             MR. PORTER:  Judge, at this time, the United States

3    moves Government's Exhibit Number 4 into evidence.

4             THE COURT:  Any objection to admission of

5    Government's 4?

6             MR. RODRIGUEZ:  No objection.

7             THE COURT:  Government's 4 is admitted without

8    objection.

9             *(Evidence admitted as Government Exhibit No. 4)*

10   BY MR. PORTER:

11   Q.  Mr. Zamot, at this time, I'm showing you Government's

12   Exhibit Number 5.  Do you recognize what this photograph shows?

13   A.  Yes, sir.

14   Q.  Can you tell us?

15   A.  Me sitting down.

16   Q.  And there is a man that is standing up walking away from

17   you.  Who is that?

18   A.  Spivey.

19   Q.  There are also papers on the table.  Are some of those

20   papers the letter that we just talked about?

21   A.  Yes, sir.

22   Q.  Now, I don't know if I asked you this, but all of these

23   photographs I've showed you, is this where you were housed in

24   the St. Lucie County jail?

25   A.  Yes, sir.

 1   Q.  This is the dormitory that you and Artavis Spivey were in.

 2   A.  Yes, sir.

 3            MR. PORTER:  Judge, at this time, the United States

 4   moves Government's Exhibit Number 5 into evidence.

 5            THE COURT:  Any objection?

 6            MR. RODRIGUEZ:  No objection.

 7            THE COURT:  Government's 5 admitted without

 8   objection.

 9            *(Evidence admitted as Government's Exhibit No. 5)*

10   BY MR. PORTER:

11   Q.  And, finally, I'm showing you Government's Exhibit

12   Number 6.  Can you tell us what this photograph shows?

13   A.  Me sitting down holding a letter in my hand.

14   Q.  And who is walking away from you?

15   A.  Spivey.

16            MR. PORTER:  Judge, at this time, the United States

17   moves Government's Exhibit Number 6 into evidence.

18            THE COURT:  Any objection?

19            MR. RODRIGUEZ:  No objection.

20            THE COURT:  Government's 6 is admitted without

21   objection.

22            *(Evidence admitted into evidence a Exhibit No. 6)*

23   BY MR. PORTER:

24   Q.  Mr. Zamot, do you remember when this happened at the

25   St. Lucie County jail?  When -- what day you and Spivey were in

1  there together?

2  A.  Probably June 22nd.

3  Q.  Did you call your mom the same day that you and Artavis

4  Spivey were housed in the same dormitory together?

5  A.  No, sir.

6  Q.  Was it the next day?

7  A.  The next morning.

8  Q.  The next morning?

9        How long were you and Artavis Spivey in the same

10  dormitory together at the St. Lucie County jail?

11  A.  Two, three days.

12  Q.  Mr. Zamot, do you remember the first time you met me?

13  A.  Yes, sir.

14  Q.  It was after court.  You had an initial appearance in the

15  courtroom right across the way.

16  A.  Yes, sir.

17  Q.  And we went over to the FBI and we sat down and we had an

18  interview session.

19  A.  Yes, sir.

20  Q.  And do you remember during that meeting I told you that

21  every time we met, you had to tell me the truth?

22  A.  Yes, sir.

23  Q.  And you agreed to tell me the truth.

24  A.  Yes, sir.

25  Q.  Now, do you remember the first time we met after this

1    incident at the jail happened?

2    A.  Say it again

3    Q.  Do you remember the first time you and I sat down and

4    talked about this incident at the jail between you and Spivey?

5    A.  Yes, sir.

6    Q.  Do you remember that?

7    A.  Yes, sir.

8    Q.  Now, the first time we sat down, you didn't tell me the

9    whole truth about what happened, did you?

10   A.  No, sir.

11   Q.  In fact, you lied about parts of it, didn't you?

12   A.  Yes, sir.

13   Q.  You told me that Artavis Spivey and several other people

14   assaulted you, hog-tied you, and held you down for over

15   45 minutes.  Do you remember that?

16   A.  Yes, sir.

17   Q.  That didn't happen, did it?

18   A.  No, sir.

19   Q.  Why did you lie to me?

20   A.  Because I was scared.

21   Q.  Are you telling the truth today?

22   A.  Yes, sir.

23   Q.  Are you telling the truth about this letter?

24   A.  Yes, sir.

25   Q.  Are you telling the truth about the threats that Artavis

1  Spivey made to you in the jail?

2  A.  Yes, sir.

3        MR. PORTER:  Judge, those are all the questions I

4  have for Mr. Zamot at this point.

5        THE COURT:  Thank you.

6        Mr. Rodriguez.

7        MR. RODRIGUEZ:  Thank you, Your Honor.  Should I go

8  up there, Your Honor?

9        THE COURT:  Yes, please.

10                    CROSS-EXAMINATION

11  BY MR. RODRIGUEZ:

12  Q.  Good morning, Mr. Zamot.  I'm the attorney who represents

13  Mr. Spivey.  I'm going to ask you a few questions, sir.

14  A.  Yes, sir.

15  Q.  First of all, you were shown the pictures of holding this

16  particular letter we've been discussing.  Isn't it true that

17  Mr. Spivey never took the letter from you?

18  A.  No, sir.

19  Q.  And Mr. Spivey never tried to use that letter to his

20  benefit?

21  A.  No, sir.

22  Q.  You talked to us about -- you called him a dude named

23  "Green" in the jail, the jail-house lawyer.  Do you recall

24  that?

25  A.  Yes, sir.

```
 1   Q.  Isn't it true this that individual in the jail told you

 2   that if you claimed that someone threatened you, you would get

 3   a lower sentence?

 4   A.  No, sir.

 5   Q.  He didn't go over that with you?

 6   A.  No, sir.

 7   Q.  Did he assist you in writing the letter?

 8   A.  Yes, sir.

 9   Q.  So Mr. Green actually helped you write this letter?

10   A.  Yes, sir.

11   Q.  And that was not Mr. Spivey.

12   A.  Yes, sir.

13   Q.  It was or was not?

14   A.  It was.

15   Q.  So you're saying that both of them sat there with you to

16   write out the letter.

17   A.  Yes, sir.

18   Q.  And did Mr. Green tell you what to do with the letter?

19   A.  No, sir.

20   Q.  Did anyone give you instructions on what to do with the

21   letter?

22   A.  Yes, sir.

23   Q.  Who was that?

24   A.  Spivey.

25   Q.  And did you follow those instructions?
```

1    A.  No, sir.

2    Q.  And you said that you did not because you -- they were not

3    the truth?

4    A.  Yes, sir.

5    Q.  Okay.  So you never actually sent this to the Court or to

6    the clerk.

7    A.  No, sir.

8    Q.  In fact, the day of the incident, you were interviewed by

9    the Highlands County Sheriff's Office.  Do you recall that

10   interview?

11   A.  Yes, sir.

12   Q.  And during that interview, you also lied to them about your

13   involvement in the incident.

14   A.  Yes, sir.

15   Q.  And were you also interviewed by any other sheriff's office

16   department that day?

17   A.  Yes, sir.

18   Q.  Do you remember who that department was?

19   A.  Lee County.

20   Q.  And did you also lie to the Lee County sheriff's deputies

21   that day?

22   A.  Yes, sir.

23   Q.  So the first day of the incident, the actual day of the

24   incident, you lied.  And then you have an interview on July --

25   excuse me -- on May 11th, 2022.  Do you recall that first

```
 1   interview when you were brought to the courthouse here, by

 2   Special Agent Christopher Mayo?

 3   A.  Yes, sir.

 4   Q.  And during that conversation with Mr. Mayo and other

 5   agents, you also lied about your involvement in the offense.

 6   A.  No, sir.

 7   Q.  No, sir?

 8   A.  No, sir.

 9   Q.  Did you ever tell them about Mr. Spivey trying to get you

10   to change your mind or write a letter at that point?

11   A.  What you mean?

12   Q.  Did you ever tell them that Mr. Spivey -- on May 11th,

13   2022, did you ever tell them on that date that Mr. Spivey was

14   trying to get you to write some sort of letter?

15   A.  No, sir, because it wasn't around that time.

16   Q.  So on that date, you're saying that Mr. Spivey had not

17   approached you and asked you to write any type of letter.

18   A.  It was in June.

19   Q.  Okay.  And you're sure that Mr. Spivey was in the same

20   facility as you in June of 2022.

21   A.  Yes, sir.

22   Q.  Now, at some point, did you also then go and have another

23   interview on July 13th, 2022, where you were transported from

24   the West Palm Beach jail?

25   A.  Yes, sir.
```

```
 1   Q.   So on May 11th, 2022, you were still at the Fort Pierce
 2   jail; is that fair to say?
 3   A.   What day?
 4   Q.   May 11th, 2022, during your first interview.
 5   A.   No, I was in Palm Beach in July 11th.
 6   Q.   You mean on July 11th?
 7   A.   I got transported on July 11th to Palm Beach.
 8   Q.   Okay.  So you were -- so on May 11th, you were still then
 9   at the St. Lucie County jail.
10   A.   Yes, sir.
11   Q.   And you did not get transported until July 11th to the Palm
12   Beach County jail.
13   A.   Yes, sir.
14   Q.   And then on July 13th, the agents picked you up and brought
15   you to the West Palm Beach FBI office.
16   A.   Yes, sir.
17   Q.   And during that time, you were asked to discuss your
18   involvement with Mr. Spivey and possible obstruction.  Do you
19   recall that?
20   A.   Yes, sir.
21   Q.   And it was on that date that you claimed that Mr. Spivey
22   actually assaulted you in your cell.
23   A.   Yes, sir.
24   Q.   But that wasn't true, was it?
25   A.   No, sir.
```

1   Q.  So what was the purpose of you telling the agents on

2   July 13th, 2022, that Mr. Spivey assaulted you in your cell?

3   A.  I was scared.

4   Q.  Did you believe that by telling them that he assaulted you

5   in the cell, that that would help you in your case?

6   A.  No, sir.

7   Q.  So you just made the lie up because you were scared.

8   A.  I wanted to move jails.

9   Q.  But you were already moved at that point, on July 13th,

10  2022.

11  A.  I told my lawyer before I got moved.

12  Q.  Right.  But I'm telling you, on July 13th, 2022, you're

13  already at the Palm Beach County jail, correct?

14  A.  Yes, sir.

15  Q.  On that day, you tell them the story about Mr. Zamot *(sic)*

16  actually physically assaulting you -- I'm sorry -- about

17  Mr. Spivey assaulting you.

18  A.  Yes, sir.

19  Q.  And you're saying that you made that story up because you

20  were still scared at the Palm Beach County jail?

21  A.  I was scared.

22  Q.  Okay.  And isn't it true that you've been told that you

23  could get a lower sentence if you can convince the Court that

24  you were threatened?

25  A.  No, sir.

```
 1   Q.  Mr. Spivey never tried to talk you out of taking a guilty
 2   plea, did he?
 3   A.  What you mean?
 4   Q.  He never told you should not take a -- enter a guilty plea
 5   in this case, did he?
 6   A.  When I pled guilty, I was never around him.
 7   Q.  Up until the time you pled guilty, he never told you, "Do
 8   not enter a guilty plea."
 9   A.  What you mean by that?
10   Q.  What I'm asking you, sir, is:  Did Mr. Spivey ever tell
11   you, "Do not enter a guilty plea whatever you do in this case"?
12   A.  No, sir.
13   Q.  So he never tried to prevent you from accepting
14   responsibility and --
15   A.  In that --
16   Q.  -- and come into court.
17   A.  In that letter.
18   Q.  But the letter you said you never sent to the court system.
19   A.  No, sir.  I put it in my property.
20   Q.  And then you gave it to your lawyer.
21   A.  Yes, sir.
22   Q.  And you gave it to your lawyer hoping that maybe it would
23   help you.
24   A.  No, sir.
25   Q.  You just gave it to her.
```

1   A.   Just gave it to her and told her the truth about it.

2   Q.   And then on September 20th, 2022, you were also brought in

3   for another interview.  Do you recall that?

4   A.   Yes, sir.

5   Q.   And during that interview, you were asked to discuss the

6   events leading up to the day of the incident.

7   A.   Yes, sir.

8   Q.   And were you completely truthful during that interview?

9   A.   Yes, sir.

10  Q.   And you admitted that you participated in a robbery.

11  A.   Yes, sir.

12  Q.   But you were never charged with a robbery.

13  A.   No, sir.

14  Q.   Then on October 6, 2022, you were brought back by the FBI

15  for another interview and in that interview, you admitted that

16  you were untruthful in the prior interview.

17  A.   What you mean?

18  Q.   You told them that you were untruthful about some of the

19  details of your interactions with Mr. Spivey in the prior

20  interviews.

21  A.   Yes, sir.

22  Q.   And, in fact, you had been advised in these prior

23  interviews that if you did not tell the truth, you could be

24  charged with perjury.

25  A.   Yes, sir.

 1    Q.  But were you ever charged with perjury for not telling the

 2    truth?

 3    A.  No, sir.

 4    Q.  Were you afraid of being charged with perjury?

 5    A.  Yes, sir.

 6    Q.  And were you able to negotiate not being charged with

 7    perjury?

 8    A.  No, sir.

 9    Q.  Now, what you told the agents on October 6, 2022, in this

10    final interview, is that you actually were told by other

11    inmates that you needed to confront and fight Spivey.

12    A.  Yes, sir.

13    Q.  So you were the person who then went into Spivey's cell and

14    fought with him for 30 seconds to a minute.

15    A.  No, sir.

16    Q.  You did not tell the agents you were the person that you --

17    that you proceeded to Spivey's cell and fought with Spivey for

18    approximately 30 seconds to a minute.

19    A.  Yes, sir, but I wasn't -- that wasn't my intentions.

20    Q.  But you told the agents that you were the person who went

21    to Mr. Spivey, confronted him, and had a fight.

22    A.  I didn't know what they was calling me in the room for.

23    Q.  Well, did you not tell the agents that you were told that

24    you needed -- by other inmates, that you needed to go confront

25    Mr. Spivey?

1   A.  After I was in the room.

2   Q.  Okay.  And then you did confront him.

3   A.  I didn't confront him but...

4   Q.  Well, you fought with him.

5   A.  Yes, sir.

6   Q.  Okay.  You threw the first punch.

7   A.  No, sir.

8   Q.  Who threw the first punch?

9   A.  He did.

10  Q.  Are you sure about that?

11  A.  Yes, sir.

12  Q.  Why were you in the room?

13  A.  Because they called me over.  I didn't know what they was

14  calling me for.

15  Q.  Well, you're telling us, up until this point, you're afraid

16  of Mr. Spivey.

17  A.  Yes, sir.

18  Q.  But you're saying to this Court that also you were called

19  by Mr. Spivey or other persons to go into his cell.

20  A.  I was called by another inmate.

21  Q.  So you weren't afraid enough to go into his cell is what

22  you're telling us.

23  A.  I was, but I didn't know what they was calling me for.

24  Q.  But you still went in his cell despite the fact that you

25  were allegedly afraid of Mr. Spivey.

```
 1   A.  Yes, sir.
 2   Q.  And then you told the agents that it was actually -- you
 3   wrestled and punched each other.
 4   A.  Yes, sir.
 5   Q.  And then at some point after that, you became friends with
 6   Mr. Spivey again?
 7   A.  Try to make friends with him because while you're
 8   incarcerated in jail, you're living with people that you don't
 9   know.  You're sleeping around them, so I'm not trying to have
10   any enemies while I'm there.
11   Q.  So despite the fact that you're afraid of him, you then now
12   start to talk with him and play cards and do things like that
13   with him in the jail.
14   A.  Under fear.
15   Q.  Under fear.
16   A.  Yes, sir.
17   Q.  So you had no other choice but to play cards and do things
18   with him in the jail?
19   A.  I didn't have any other choice -- I had another choice, but
20   it was just how it went.
21   Q.  So what was your other choice?
22   A.  I could have stood in my room, read a book.
23   Q.  And I want to make sure this is clear.  Mr. Spivey never
24   actually took this letter from you and tried to use it himself.
25   A.  No, sir.
```

```
 1   Q.  Mr. Spivey never told you not to enter a guilty plea.

 2   A.  What you mean?

 3   Q.  He never told you, "Do not enter a guilty plea."

 4   A.  In the letter, but before I met him, I already pled guilty.

 5   Q.  So you're saying that before you met Mr. Spivey, you

 6   already pled guilty?

 7   A.  Basically what I'm saying is, I already pled guilty before

 8   me and him was in the jail together.

 9   Q.  But didn't you wait to plead guilty to this case until some

10   point later?

11   A.  Say that again?

12   Q.  Do you recall the date you pled guilty on this case?

13   A.  I think it was in June.

14   Q.  Would June 24th, 2022, sound correct?

15   A.  Yes, sir.

16   Q.  Okay.  So you had pled guilty at that point, June 24th,

17   2022.

18   A.  Yes, sir.

19   Q.  And you're saying that that date is after this accident on

20   June 22nd, 2022.

21   A.  Say it again?

22   Q.  I'll state it to you this way.  You're saying that you were

23   asked to write the letter on June 22nd, 2022?

24   A.  I don't recall the date.  I don't remember what date it

25   was, but I already pled guilty before he was housed in the same
```

1  housing unit that I was housed in.

2  Q.  But didn't you just tell the Government when they were

3  asking you questions that this incident happened on June 22nd,

4  2022?

5  A.  Yeah, but I don't remember the specific date because when

6  I'm incarcerated, I don't look at the time or date because I

7  don't care about the time or day.  I just let it go by.

8  Q.  So you're basically -- when you answered the question of

9  the Government, you just sort of agreed with him even though

10  you really didn't know if that was the right answer.

11  A.  I didn't really remember the date it was.

12  Q.  So you just agreed with the Government because he asked you

13  the question.

14  A.  No, sir.

15  Q.  Well, you said this happened on June 22nd, 2022.

16  A.  Yes, sir.

17  Q.  Okay.  Do you believe that's the date that this letter

18  writing incident occurred?

19  A.  No, sir.

20  Q.  You don't believe it.

21  A.  Uh-uh.

22  Q.  June 24th, 2022, you entered a guilty plea in front of this

23  Court.  Do you recall that?

24  A.  Yes, sir.

25          MR. RODRIGUEZ:  That's all I have, Your Honor.

```
 1                THE COURT:  Thank you.
 2                Mr. Porter.
 3                MR. PORTER:  One second, please, Judge.
 4                     REDIRECT EXAMINATION
 5   BY MR. PORTER:
 6   Q.  Mr. Zamot, when Mr. Rodriguez was up here asking you
 7   questions --
 8   A.  Yes, sir.
 9   Q.  -- he asked you about a robbery that you told us about that
10   you weren't charged for.
11   A.  Yes, sir.
12   Q.  In fact, it was a burglary, correct?
13   A.  Yes, sir.
14   Q.  Tell us about that.
15   A.  Before the carjacking happened, we were walking towards
16   houses, like a neighborhood with houses that looked like they
17   have money in it and --
18   Q.  When you say "we," who do you mean?
19   A.  Me and Spivey.
20   Q.  And you said "before the carjacking," is this the same day
21   as the carjacking?
22   A.  Yes, sir.
23   Q.  Okay.  Tell me what happened.
24   A.  Earlier in the morning.
25   Q.  Tell me what happened.
```

```
 1   A.  We got to a house, knocked on the door, and then broke the
 2   window and got in the house and took a few items out of the
 3   house, and we left.
 4   Q.  What did you take out of the house?
 5   A.  Took a speaker, gold coins, and money.
 6   Q.  What did Spivey take out of the house?
 7   A.  Gold coins and money.
 8   Q.  Whose idea was it to burglarize the home?
 9   A.  Spivey.
10   Q.  What did he tell you?
11   A   Told me to basically see if this house got anything in it.
12   I ain't never been in a house -- somebody's house without
13   breaking in it -- I ain't never broke in nobody house before.
14   Q.  What did Spivey tell you to do when you first got to the
15   house?
16   A.  Break the window.
17   Q.  Mr. Zamot, you remember the letter that we talked about on
18   your direct examination, Government's Exhibit Number 1.
19   A.  Yes, sir.
20   Q.  What did Artavis Spivey tell you to do with this letter?
21   A.  Basically, he told me to take all the guilt for this charge
22   and let him -- basically, he was never involved in it and that
23   he will go free.
24   Q.  After you wrote this letter, what did Artavis Spivey tell
25   you to do with the letter?
```

1    A.   Say it again.

2    Q.   After you wrote the letter, did Mr. Spivey tell you to do

3    anything with it?

4    A.   Told me to send it to the clerk of court.

5    Q.   He told you to send it to the clerk of court.

6    A.   Yes, sir.

7    Q.   But you didn't do that.

8    A.   No, sir.

9    Q.   Because you knew the information in there wasn't true.

10   A.   Yes, sir.

11   Q.   Now, when Mr. Rodriguez was asking you questions, he asked

12   you several questions about the exact date that this incident

13   happened at the St. Lucie County jail --

14   A.   Yes, sir.

15   Q.   -- when you wrote this letter.  You don't remember the

16   exact date, do you?

17   A.   No, sir.

18   Q.   You do remember it was in June.

19   A.   Yes, sir, because I got transported on July 11th.

20   Q.   And you were transported after this happened.

21   A.   Yes, sir.

22   Q.   Because you called your attorney and you told your

23   attorney.

24   A.   Yes, sir.

25   Q.   And then your attorney reached out to me, and you were

```
 1   transported to the Palm Beach County jail.
 2   A.  Yes, sir.
 3             MR. PORTER:  One second, Judge.
 4             (Brief pause in proceedings)
 5             MR. PORTER:  Judge, the United States has no further
 6   questions for this witness.
 7             THE COURT:  Thank you.
 8             Thank you, Mr. Zamot.  You may be excused.
 9             (Witness excused)
10             THE COURT:  All right.  Let me hear argument from
11   Counsel on the application of this enhancement.
12             Mr. Porter, I'd like you to focus in on exactly what
13   you think the defendant did to support the enhancement, why it
14   warrants the enhancement, and how it actually hindered the
15   investigation, prosecution, or sentencing of the offense of
16   conviction.  And I'm summarizing from the guideline.
17             MR. PORTER:  Judge, I do have one more witness to
18   call.
19             THE COURT:  Oh, okay.  Who is that?
20             MR. PORTER:  It will be a quick witness.
21             THE COURT:  Okay.  Please call your next witness.
22             MR. PORTER:  The United States calls Clara Flores.
23             THE COURT:  Ms. Flores, please make your way up to
24   the witness stand.
25             Good morning, ma'am.  If you could come over here,
```

 1    please.

 2              Please stay standing to be sworn in.

 3              THE COURTROOM DEPUTY:  Please raise your right hand.

 4    **CLARA FLORES, GOVERNMENT'S WITNESS, WAS SWORN**

 5              THE WITNESS:  Yes.

 6              THE COURTROOM DEPUTY:  Please have a seat.

 7              Please state your full name for the record and spell

 8    it, please.

 9              THE WITNESS:  My name is Clara Flores.  Last name --

10    the full name?

11              THE COURTROOM DEPUTY:  Yes, please.

12              THE WITNESS:  Clara, C-L-A-R-A, Flores, F-L-O-R-E-S.

13                         <u>DIRECT EXAMINATION</u>

14    BY MR. PORTER:

15    Q.  Good morning, ma'am.

16    A.  Good morning.

17    Q.  You have been present in the courtroom all morning,

18    correct?

19    A.  Yes.

20    Q.  Your son just testified.

21    A.  Yes.

22    Q.  Daniel Zamot, you are his mother.

23    A.  Yes.

24    Q.  Ms. Flores, do you remember when your son was at the

25    St. Lucie County jail?

1   A.  Yes.

2   Q.  Did he make a phone call to you when he was at the

3   St. Lucie County jail?

4   A.  Yes.

5   Q.  Did that phone call trouble you?

6   A.  Yes, it did.

7   Q.  Please tell me what he said to you during that phone call.

8   A.  I was working that day and he just called me, and I felt

9   like he was kind of scared when he was talking to me, and I

10  asked him what was going on.  I asked him if he was crying, and

11  he tried to say no, and I felt something was happening.

12          Then he told me, "Mommy, can you please move as soon

13  as possible?"

14          And I asked him why, but he didn't answer me.  He

15  said he couldn't talk to me, and he couldn't say nothing on the

16  phone.

17  Q.  Did he also ask you to call his attorney?

18  A.  Yes, he did.

19  Q.  Were you able to tell from your son's voice whether he was

20  scared?

21  A.  Yes.

22  Q.  Do you believe he was scared when he called you that day?

23  A.  Yes.

24  Q.  Thank you.

25          MR. PORTER:  That's all I have, Judge.

```
 1                THE COURT:  Mr. Rodriguez?

 2                MR. RODRIGUEZ:  I have no questions, Your Honor.

 3                THE COURT:  Thank you very much, Ms. Flores.  You may

 4     return to the gallery.

 5                THE WITNESS:  Thank you.

 6                (Witness excused)

 7                THE COURT:  Mr. Porter, do you have any other

 8     evidence to present in support of the enhancement?

 9                MR. PORTER:  No, Your Honor.

10                THE COURT:  Mr. Rodriguez, do you have any evidence

11     in opposition to the enhancement?

12                MR. RODRIGUEZ:  No, Your Honor, just argument.

13                THE COURT:  Okay.

14                All right.  And just to be clear, we are discussing

15     now the obstruction of justice enhancement at paragraph 32 of

16     the PSI, which derives from guideline Section 3C1.1.

17                So let me hear argument on this point, starting with

18     the Government.

19                MR. PORTER:  Judge, first, to kind of set the stage

20     and the backdrop with respect to the particular obstruction of

21     justice enhancements that the United States believes apply,

22     there is no requirement that the conduct at issue materially

23     impact or hinder the investigation or judicial proceeding.

24                The United States is of the opinion that if Your

25     Honor were to find that Artavis Spivey directed Daniel Zamot to
```

1    write that letter, and Daniel Zamot, in fact, wrote that letter

2    falsely exonerating Artavis Spivey, that alone is sufficient to

3    support the obstruction of justice enhancement.

4              THE COURT:  How does your argument work, though?  So

5    that the actual sort of body of the guideline says:  "If the

6    defendant willfully obstructed or impeded or attempted to

7    obstruct or impede the administration of justice with respect

8    to the investigation, prosecution, or sentencing of the instant

9    offense of conviction," and then it continues, "increase by two

10   levels."  Are you saying that because the unlawful influence of

11   a codefendant later appears as an example in the commentary --

12             MR. PORTER:  Well, two things.

13             THE COURT:  -- there's less of a need to adhere to

14   the actual guideline text?

15             MR. PORTER:  No.  What I'm saying is, there is

16   examples of covered conduct, so this is in the application

17   note; and specifically, I'm referring to application note 4,

18   and this is where the Sentencing Commission tells us this is

19   the type of conduct that applies to this enhancement.

20             If we look at application note 4(C), "producing or

21   attempting to produce a false, altered, or counterfeit document

22   or record during an official investigation, an official

23   investigation or judicial proceeding."  All we have here is a

24   false letter purporting to exonerate Artavis Spivey of the very

25   crime that he is charged with committing in a judicial

 1    proceeding before he has, in fact, pled guilty.

 2           Also, this comes on the heels of Artavis Spivey

 3    learning that Daniel Zamot intended to cooperate against him

 4    and testify against him at trial.  That, in and of itself -- we

 5    cite two cases in our sentencing memo that justify the

 6    application of the obstruction enhancement -- I'm sorry, our

 7    response to the objections under this scenario, "attempting to

 8    coerce a material witness to provide a false statement is

 9    sufficient in and of itself to warrant the obstruction of

10    justice enhancement."  And here's why it's important, Judge.

11    At this point, Artavis Spivey had yet to plead guilty, and

12    Daniel Zamot was going to be Government's witness number one at

13    trial against him.

14           So what did Artavis Spivey do?  He directed Daniel

15    Zamot to write a false letter exonerating Artavis Spivey.  How

16    did that potentially impact the judicial proceeding?  Well,

17    now, if I had to put Daniel Zamot on to testify at trial, that

18    was going to give his attorney the ability -- that was going to

19    give Defense Counsel the ability to cross-examine Daniel Zamot

20    based on that statement at Artavis Spivey's trial.  That

21    strikes at the heart of obstruction of justice why the

22    enhancement applies and why it's there.  That type of

23    obstruction simply cannot be tolerated, and it is entirely

24    consistent with the application note and also the language of

25    the obstruction enhancement.

1          But that's not all.  I think that is the easiest path

2     for Your Honor to get there, but we also have application

3     note 4(B), which says -- this is another type of covered

4     conduct.  And, again, this type of conduct does not require

5     that it materially impact or hinder the investigation or

6     judicial proceeding.

7          The Eleventh Circuit has also held that the defendant

8     need not be successful in his attempt to impede or obstruct the

9     administration of justice in order for the enhancement to

10    apply.  That's *United States v. Taylor* -- we also cite that in

11    our response -- from the Eleventh Circuit, 1996.

12         Application note 4(B) says that the application

13    applies when the defendant commits, suborns, or attempts to

14    suborn perjury.  I think this also falls into this category.

15    Artavis Spivey was attempting to get Daniel Zamot to suborn

16    perjury, to lie about the offense and falsely exonerate him so

17    that he didn't have to face the consequences of the charges

18    against him.  So I think application note 4(B) applies.  Again,

19    I think application note 4(C) is the easiest path for the Court

20    to get there.

21         Finally, I also submit that application note 4(A)

22    applies.  Application 4(A) says that this type of conduct is

23    included within the obstruction of justice enhancement:

24    "Threatening, intimidating, or otherwise unlawfully influencing

25    a codefendant, witness, or juror directly or indirectly or

1    attempting to do so."

2            Daniel Zamot is both a codefendant and a potential

3    witness, and what Artavis Spivey was attempting to do here was

4    coerce Daniel Zamot into giving false testimony to exonerate

5    him.  I think that fits squarely within application note 4(A)

6    to the guidelines.  Again, I also think it strikes at the heart

7    of this enhancement, the administration of justice and how

8    Artavis Spivey attempted to obstruct it.

9            I also think that Artavis Spivey threatened Daniel

10   Zamot or at least his family.  And I understand that the Court

11   heard testimony from Daniel Zamot, and there are instances

12   where he was untruthful with the United States when he first

13   came forward about what happened at the jail.  He said that he

14   was assaulted by Artavis Spivey and several other individuals.

15   We now know that that didn't happen.  However, I do think that

16   there is sufficient corroborating evidence that Artavis Spivey

17   did threaten Daniel Zamot or his family.  And the way that we

18   know that is this letter.  There is absolutely no value to

19   Daniel Zamot writing this letter.  There is no reason for him

20   to do that.  The only person that this letter benefits is

21   Artavis Spivey.

22           Finally, we -- so I think that corroborates Daniel

23   Zamot's testimony that he in fact wrote that letter.  But even

24   if that's all you had, I think that's enough to get there, but

25   we also have photographs from the St. Lucie County jail.  When

```
 1    Daniel Zamot and Artavis Spivey are housed in the same

 2    dormitory, they're sitting down at a table, Daniel Zamot is

 3    writing a letter, and Artavis Spivey is sitting right there

 4    with him.  So we have corroboration that this letter was, in

 5    fact, written by Daniel Zamot at the behest of Artavis Spivey

 6    when, according to Daniel Zamot, a jail-house lawyer was also

 7    there instructing Daniel Zamot along with Artavis Spivey what

 8    to put in the letter.

 9            So it's not just Daniel Zamot's testimony alone,

10    Judge.  There is corroborating evidence here to support the

11    enhancement.  I think it applies under application note 4(A),

12    (B), or (C).  I do think application note 4(C) is the easiest

13    path to get there.  We cite two cases in our response that

14    stand for the proposition that merely asking a witness or a

15    codefendant to write a false letter exonerating one is

16    sufficient in and of itself to support the application of the

17    obstruction of justice enhancement.

18            And finally, you also heard from Mr. Zamot's mom -- I

19    also think that corroborates his testimony today -- that he was

20    in fact scared of something.  He called his mom and he told her

21    to move.  That is consistent with a threat, and it's also

22    consistent with this letter that Artavis Spivey directed him to

23    write.

24            So the United States submits that the enhancement is

25    warranted under the facts of this case.  You can get there
```

1    under application note 4(A), (B), or (C); I think all of them

2    apply.  And the Government submits that it's met its burden by

3    a preponderance of the evidence.

4         THE COURT:  And so your argument is not that the

5    Court need weaken or minimize the language in the body of the

6    guideline itself, it's, I guess, merely that these are examples

7    of conduct that would fit into the attempted obstruction

8    category, quote, with respect to the investigation,

9    prosecution, or sentencing of the instant offense?

10        MR. PORTER:  Precisely, Judge.

11        THE COURT:  All right.

12        Okay.  Thank you.

13        Let me hear from Mr. Rodriguez.

14        MR. RODRIGUEZ:  May it please the Court, Your Honor,

15   our first problem, obviously, is with the accuracy of the

16   evidence before the Court.  The Government failed to establish

17   when this letter was written.  They asked the question of the

18   witness, "Was it June 22nd, 2022?"  The witness, then under

19   cross-examination, said, "I'm not sure, I'm not sure at all."

20   They did not establish when those photographs were taken, what

21   day those photographs were taken that were entered into

22   evidence.  So we don't know when this letter was written at

23   all.

24        Secondly, we do have before the Court a witness who

25   has told this Court over and over again that he was untruthful

```
 1    about all sorts of details in the investigation himself.

 2             Now, this letter could not serve to hinder any

 3    investigation because, in fact, it was never used, except in

 4    one way.  It's been used by the codefendant to show that he was

 5    somehow threatened to mitigate his sentence, which you'll be

 6    doing his hearing later today.  That's the own way it's been

 7    used.  There's no evidence that Mr. Spivey ever took the letter

 8    and tried to use it.  There's no evidence he even took a copy

 9    of it.  There's no evidence that it was actually sent to the

10    clerk of court --

11             THE COURT:  Is all that required?  I mean, under the

12    case law, is it necessary that Mr. Spivey himself send the

13    letter?  Is it not enough at a minimum indirectly directing

14    Mr. Zamot, according to the Government, to send the letter?

15             MR. RODRIGUEZ:  I don't believe it is because I

16    believe that the Government is required under the United

17    States v. Shriver case to present evidence establishing that

18    the investigation has been hindered by virtue of the letter.

19    The Government produced no hindrance whatsoever.  I mean, the

20    only hindrance we have here in this investigation is Mr. Zamot

21    lying over and over in these reports, but there was no

22    hindrance.  This letter was never used.  It was never

23    introduced into evidence.  It was never brought for -- it

24    didn't stop the process, Your Honor.

25             According to what I'm reading here, two days later,
```

```
 1   if this actually happened on June 22nd, two days later, the
 2   defendant and -- the codefendant, Mr. Zamot, enters a guilty
 3   plea.  And then a month and a half, two months later,
 4   Mr. Spivey enters a guilty plea.
 5              So there's been no hindrance, and citing an Eighth
 6   Circuit case, United States v. Williams which held that the
 7   enhancement is improper where there is no actual hindrance of
 8   efforts.  So that's what you didn't get in today's testimony
 9   was actual hindrance.
10              What the Government is trying to tell you is this had
11   the potential to hinder, but they haven't explained how this
12   would ever hinder.  They're saying, well, if this and this and
13   this had happened, but none of that --
14              THE COURT:  Doesn't the commentary say "or attempting
15   to do so"?  For example, in (A), unlawfully influencing a
16   codefendant or attempting to do so, producing or attempting to
17   produce a false record, or committing or attempting to suborn
18   perjury?  So I guess why do we have to have this materialized
19   result?
20              MR. RODRIGUEZ:  I don't think it has to be -- I think
21   there has to be a hindrance, first of all.  So you have to
22   show, even if this was an attempt, what type of hindrance does
23   the attempt do.  So I'm understanding where the Court is coming
24   from, but also I think the Court needs to think about the
25   nature of the evidence of how this came about.
```

1          I don't think before this Court there's credible

2    evidence from the witness who took the stand about this letter,

3    the whole circumstances around it.  The Government has tried to

4    piece it together by showing us a picture, undated, of the two

5    codefendants sitting there, but I think the Court can find as a

6    matter of law this witness is not credible.  He has proven that

7    over and over again in actually hindering the investigation by

8    lying to the agents on numerous occasions and then changing his

9    mind.

10          And, you know, the Government says, "Well, he lied

11    because he was scared."  Okay, fine, but it's our position that

12    this attempt by Mr. Zamot to write this letter has not been

13    actually connected to my client by competent evidence.  That's

14    all I'm trying to say.  If there were competent evidence, I

15    would agree with your analysis, Your Honor, with the attempts

16    and the commentary notes.

17          Our primary focus is that there's a lack of competent

18    evidence, and that was before the Court based on the testimony

19    of Mr. Zamot who took the stand.

20          You know, I don't know how else to argue it except

21    that that's what it is.  This document never made it to the

22    system other than through the lawyer for Mr. Zamot, you know,

23    which then led to, you know, the allegation of an obstruction

24    of justice.

25          Also, what's very telltale here, which I don't quite

1   understand, Your Honor, is that --

2        THE COURT:  Well, I mean, it never made it to the

3   system because Mr. Zamot declined to send it.  So had he not

4   made that decision on his own, it would have made its way to

5   the system.  Am I wrong about that?

6        MR. RODRIGUEZ:  You're right, Your Honor, about that;

7   but my suggestion is he creates this document and gives it to

8   his lawyer so he can tell his lawyer, "Look, this is what's

9   happening," okay?  And then the lawyer, of course, is not going

10  to use it to hinder the system.  It's actually being used as a

11  benefit to him.  That's how the system works.  You get benefits

12  when you're threatened, movement for downward departures and

13  things of that nature.

14       The thing that just doesn't make sense, Your Honor,

15  in listening to the testimony of this witness is, he says he is

16  fearful of Mr. Spivey, but on the other hand, he goes into his

17  room, he plays cards with him, he does things with him, even

18  after this incident supposedly.  I just believe the Court can

19  find as a matter of law that this witness was not fearful and

20  did not write this for any other reason that he just wrote it.

21       That's all I have.

22       THE COURT:  All right.  Thank you.  I appreciate the

23  argument.

24       Any response from the Government?

25       MR. PORTER:  Just briefly, Judge.

1          As far as Mr. Zamot's credibility and whether he was

2     fearful, to put this in context, Mr. Zamot and Artavis Spivey

3     were never supposed to be housed in the same facility together.

4     There was a separation order in place.  Mr. Zamot was placed in

5     an untenable position, a position that he did not create or

6     originate.  He sees Artavis Spivey come into his dormitory.  He

7     knew he was not supposed to be housed in the same facility as

8     Artavis Spivey because he had already agreed to cooperate with

9     the United States, and that information had already been

10    released to counsel for Mr. Spivey.

11         So I think if you put yourself in Mr. Zamot's shoes,

12    what was he supposed to do in that situation?  He is now in the

13    same dormitory as his codefendant who he is cooperating

14    against.  I think he was in an untenable position.  Just the

15    fact that he tried to make nice with Artavis Spivey and play

16    games with him I do not believe is inconsistent under these

17    circumstances with being fearful because you have to ask

18    yourself:  What else was he supposed to do?

19         I didn't know he was in there.  I had no ability to

20    move him until I found out about it.  So he is truly placed in

21    an untenable position, and I do not believe that his actions in

22    response to that are inconsistent with being fearful.

23         As far as the obstruction enhancement, again, Judge,

24    the United States submits that there is no hindrance

25    requirement or materially impact requirement.  And the way we

 1    know that is, if you look at the application notes, if you look

 2    at application notes 4(A), (B), and (C), they don't contain

 3    that requirement.  But if you look at some of the other

 4    application notes, for example, application note 4(D) and 4(G),

 5    they do contain that requirement.

 6         Again, with respect to the application notes that the

 7    United States is advancing, 4(A), (B), and (C), there is no

 8    requirement that the conduct at issue hinder or materially

 9    impact the investigation.  And the United States submits that

10    the mere attempt to engage in the obstruction of justice under

11    these circumstances is sufficient to warrant application of the

12    enhancement.

13         THE COURT:  All right.  Thank you.

14         So now, I will proceed to hear argument or any

15    evidence on the acceptance.  I'd like to rule on both disputed

16    objections together, so let's turn to that.

17         I understand the Government is standing by its

18    recommendation to support a two-level reduction for acceptance.

19    Is there anything else the Government wishes to add on that

20    point?

21         MR. PORTER:  No, Judge.  And to give the Court some

22    context as to why that language is in the plea agreement, one,

23    it is in the plea agreement and the Government does intend to

24    stand by it.  At the time we entered into the plea agreement,

25    the United States did not know what the end result would be at

```
 1   the sentencing hearing in this case, whether Your Honor would
 2   find that the obstruction is appropriate or not.  If Your Honor
 3   found the obstruction was not appropriate, then he would be
 4   entitled to those two levels.  The United States did withhold
 5   the third point, and I think it is warranted in this case.  I
 6   stand by that decision.
 7            Ultimately, as far as that two points, I also think
 8   that it is important, Judge, to remember that at the end of the
 9   day, this defendant did plead guilty; the United States did not
10   have to go to trial in this case.  So I do think that there is
11   some value in this type of scenario.  Even though I submit that
12   the obstruction enhancement properly applies and the facts
13   support it, I do believe that there is some value in still
14   giving the defendant the two levels of credit for ultimately
15   pleading guilty and avoiding a trial.
16            THE COURT:  All right.  Thank you.
17            Mr. Rodriguez, I'd like to hear from you on the
18   acceptance or lack of acceptance.
19            MR. RODRIGUEZ:  Your Honor, at this time -- Your
20   Honor, at the time we negotiated the plea, these facts were
21   known regarding the allegation of this letter.  And I believe
22   that the Government's recommendation of accepting -- of
23   allowing the two level is something that we've determined would
24   be fair and appropriate under the circumstances.  This would
25   have been a very long trial, very complex, out-of-county
```

```
 1    witnesses.  There would have been a lot of work here.  We would
 2    have had to put the alleged victim through a trial.  And my
 3    client came to the decision to enter the guilty plea, and the
 4    two levels is very significant given the high level of these
 5    guidelines and what they are.
 6                THE COURT:  Am I correct that there's been no
 7    statement of responsibility given to probation?
 8                MR. RODRIGUEZ:  Your Honor, no, there was not.  I
 9    mean, I could have my client on the record give it, if the
10    Court needs it, but I think --
11                THE COURT:  Well, I just wanted, you know, to quote
12    from the commentary.  It says:  "A defendant who enters a
13    guilty plea is not entitled to an adjustment under the section
14    as a matter of right."
15                And so my question is:  Certainly, the guilty plea is
16    very strong evidence of acceptance, but I'm wondering if there
17    are any additional indicia of acceptance other than the guilty
18    plea by itself.
19                MR. RODRIGUEZ:  I have -- if I can just talk to my
20    client one second, Your Honor.
21                THE COURT:  Okay.
22                (Discussion off the record between Counsel and
23                Defendant)
24                MR. RODRIGUEZ:  Your Honor, my client would like to
25    fulfill that requirement now, if you wouldn't mind putting him
```

1    under oath.

2            THE COURT:  All right.  Let's swear Mr. Spivey in.

3            THE COURTROOM DEPUTY:  Please raise your right hand,

4    sir.

5    **ARTAVIS SPIVEY, DEFENDANT HEREIN, WAS SWORN**

6            THE COURTROOM DEPUTY:  Thank you.  Please have a

7    seat.

8            THE COURT:  Thank you, Mr. Spivey.  Please get close

9    to the microphone so I can hear you properly.

10                          EXAMINATION

11   BY MR. RODRIGUEZ:

12   Q.  Mr. Spivey, what would you like to tell the Court regarding

13   your acceptance of responsibility for this offense

14   A.  I would like to just say sorry to the victim and sorry for

15   putting her through that and having to go through all this, and

16   that's really it.

17           THE COURT:  All right.

18   BY MR. RODRIGUEZ:

19   Q.  And do you accept responsibility, Mr. Spivey, for these

20   offenses?

21   A.  Yes.

22           MR. RODRIGUEZ:  Thank you.

23           THE COURT:  All right.  Thank you, sir.

24           All right.  Having considered the parties' arguments

25   as to both guideline provisions, and having weighed the

1    testimony offered this morning in support of the obstruction

2    enhancement along with the documentary exhibits, including the

3    letter drafted by Mr. Zamot and the still photographs from the

4    St. Lucie County jail along with the testimony of Mr. Zamot's

5    mother, I do find the Government has met its burden to support

6    an obstruction enhancement under 3C1.1., and I will make my

7    findings on the record at this time.

8            What we have here is testimony from a codefendant,

9    albeit one who has had some issues with credibility, but

10   ultimately I do believe was truthful today in the courtroom in

11   his testimony that he was directed by Mr. Spivey to author a

12   letter falsely stating that Mr. Spivey did not play the actual

13   role that he played in the offense.  That testimony I think

14   clearly is false based on the admitted conduct of Mr. Spivey.

15           The letter itself references the case number, and

16   there is credible testimony, the Court finds, that Mr. Spivey

17   directed Mr. Zamot to send the letter to the clerk of the

18   court.  The fact that Mr. Zamot ultimately declined to do so I

19   don't think defeats application of the enhancement given the

20   commentary examples listed under "Examples of Covered Conduct,"

21   neither of which -- and I'm referring to (A), (B), and (C) --

22   explicitly refer to material hindrance of the investigation,

23   and that is in contrast to other examples in that guideline

24   provision.

25           So what we're left with here I think is sufficient

1    evidence to satisfy the preponderance standard that Mr. Spivey,

2    at the very least, attempted to produce a false record during

3    an official investigation or judicial proceeding.  This would

4    have been prior to Mr. Spivey's guilty plea following

5    Mr. Zamot's guilty plea.  And so although there was some

6    confusion on the part of Mr. Zamot with respect to the exact

7    date in June, I am satisfied that this drafting of the letter

8    took place after Mr. Zamot's guilty plea, prior to his transfer

9    away from the St. Lucie County jail.

10            I'm also satisfied with the Government's presentation

11   that this conduct would satisfy both commentary examples (A)

12   and (B) in that Mr. Zamot felt threatened and conveyed that

13   fear to his mother asking her to move residences.

14            So all of this being said, I do believe the record

15   supports application of the enhancement for obstruction, and

16   the Court will therefore impose it.

17            With respect to acceptance, I will grant the

18   two-level reduction for acceptance of responsibility under the

19   circumstances.  Although the Court is certainly troubled by the

20   obstructive conduct, I'm persuaded at the end of the day to

21   give Mr. Spivey the benefit of his guilty plea which, as I've

22   been told, saved both parties substantial resources in not

23   having to present this matter at trial.

24            So with that ruling, Mr. Vreeland, can you please let

25   us know what impact that will have on the ultimate guideline

```
 1   range?

 2            PROBATION OFFICER:  Yes, Your Honor.

 3            The adjusted offense level in this case in

 4   paragraph 34 stays the same; however, he now receives a

 5   two-level reduction under paragraph 36 which gives him a total

 6   offense level of 24.  So based on a total offense level of 24,

 7   with a criminal history category of four, his guideline range

 8   as to Count 1 is 77 to 96 months, and there's an 84-month

 9   consecutive term as to Count 2.  So his overall guideline range

10   is now 161 to 180 months, Your Honor.

11            THE COURT:  Okay.  All right.  Thank you.

12            Mr. Rodriguez, I understand you will preserve your

13   objections as previously made, but do you disagree, given the

14   Court's ruling, that that is the correct guideline range?

15            MR. RODRIGUEZ:  Your Honor, we agree that that is the

16   correct guideline range at this point given the Court's

17   rulings.

18            THE COURT:  Okay.

19            All right.  Anything further from the Government with

20   respect to the guidelines themselves?

21            MR. PORTER:  No, Your Honor.

22            THE COURT:  Okay.  Any other matters to discuss with

23   respect to the PSI, Mr. Rodriguez?

24            MR. RODRIGUEZ:  No, Your Honor.

25            THE COURT:  Okay.
```

1          Anything on that front from the Government?

2          MR. PORTER:  No, Your Honor.

3          THE COURT:  All right.  Well, then let me state for

4     the record what the applicable calculations are.

5          Total offense level 24, criminal history category IV

6     which produces an advisory guideline range on Count 1 of 77 to

7     96 months' imprisonment followed by the mandatory consecutive

8     sentence on Count 2 of 84 months.  The supervised release range

9     on Counts 1 and 2 is two to five years advisory.  There's a

10    recommended fine of 30,000 to $300,000, although no fine is

11    recommended.  We have the mandatory restitution of $3500, and

12    we have the special assessment of $200 combining both Counts 1

13    and 2.

14         Is that correct, Mr. Rodriguez?

15         MR. RODRIGUEZ:  That is correct, Your Honor.

16         THE COURT:  Is that correct, Mr. Porter?

17         MR. PORTER:  Yes, Your Honor.

18         THE COURT:  All right.

19         Having calculated the advisory guideline range, I

20    will now go ahead and adopt the PSI in full with the adjustment

21    to give the defendant credit for the two levels acceptance of

22    responsibility.  With that, let's turn to hear argument from

23    the parties on an appropriate sentence, starting with the

24    Government.

25         MR. PORTER:  Judge, the United States is asking for a

1    sentence of 180 months imprisonment in this case, a total

2    sentence of 180 months.  It is at the top, the very top of the

3    guidelines.  I believe that it's warranted based on the 3553(a)

4    factors in this case.  The 3553(a) factors that stand out the

5    most to me are the nature and circumstances of the offense, the

6    need to promote respect for the law, and the need to provide

7    adequate specific and general deterrence.

8            With respect to the nature and circumstances of the

9    offense, this is a very serious offense, Judge.  Artavis Spivey

10   and Daniel Zamot robbed a woman at gunpoint, in broad daylight,

11   as she was sitting in her car at her place of business.  The

12   consequences that this has had on the victim in this case, who

13   Your Honor will hear from later on, are enormous.  This was a

14   callous act of depravity.

15           It is hard for me to understate the severity of this

16   crime.  Imagine what it must feel like for someone in the

17   victim's shoes to be sitting in their car on a lunch break, to

18   have two masked men come up to them, one of whom brandishes a

19   loaded firearm and threatens to shoot her.  It is absolutely

20   terrifying when you think about it.  A strong message needs to

21   be sent in this case.  I can't speak for other districts or

22   other cities, but as far as the northern region of the -- the

23   United States Attorney's Office for the Southern District of

24   Florida is concerned, this type of conduct cannot stand nor

25   will we allow it to become commonplace.

```
 1          A sentence at the top of the guideline range is
 2   justified based on the 3553(a) factors in this case.  The
 3   United States submits that the 3553(a) factors call out for a
 4   sentence at the top of the guideline range.
 5          As far as the history and characteristics of the
 6   defendant, Mr. Spivey is only 21 years old yet he has already
 7   amassed no less than five felony convictions:  Burglary, theft
 8   of a firearm, burglary, theft of a motor vehicle, and burglary.
 9          To be clear, before he committed the instant offense,
10   he had already burglarized multiple residences, stole several
11   firearms, and stole a vehicle all by the age of 21.  To say
12   that Mr. Spivey has pursued a life of crime would be a gross
13   understatement.
14          More importantly and far more troubling to the United
15   States, Judge, is the fact that he committed this offense, an
16   armed carjacking, 18 days after he was released from custody
17   from the Florida Department of Corrections after serving a
18   four-year sentence for the crimes that I just mentioned.  Think
19   about that for a minute.  He goes to prison for four years for
20   what I would classify as serious felonies -- burglaries,
21   stealing guns, stealing cars -- he spends four years in prison,
22   and what does he do less than three weeks after he gets out of
23   prison?  He robs a woman at gunpoint, in broad daylight, steals
24   her car and drives away with it and leads law enforcement on a
25   high-speed chase through multiple counties during which he
```

```
 1    ultimately crashes the vehicle.  That's 18 days after he gets

 2    out of prison for serving a four-year sentence.  This is what

 3    he does.

 4            There is a profound need in this case to provide

 5    adequate specific and general deterrence.  More importantly,

 6    specific deterrence when it comes to Mr. Spivey.  Mr. Spivey's

 7    repeated flouting of the law suggests that recidivism is a very

 8    active concern in this case and underscores the need to protect

 9    the public from further crimes of the defendant.  The fact that

10    he has not served a sentence as long as the one he now faces

11    may very well be the reason that he continues to violate the

12    law.  He spent four years in prison; however, that four years

13    was clearly insufficient to impress upon him the need to obey

14    the law and conform his conduct to the requirements of society.

15            Judge, the United States submits, again, the 3553(a)

16    factors in this case call out for a sentence at the top of

17    Mr. Spivey's guideline range, 180 months, and that's what we're

18    asking for.

19            THE COURT:  What would you say to the Defense

20    argument that he's a very young man and that his upbringing was

21    very, very challenging and perhaps there is some hope that he

22    could turn things around?

23            MR. PORTER:  Judge, I'm a firm believer that hope

24    springs eternal, so I do believe that at some point, hopefully

25    at least 180 months from now, that Mr. Spivey does turn things
```

```
 1    around.  I think we all hope that that happens.

 2             I also think that to some extent, all of us are a

 3    product of our circumstances; however, that does not negate the

 4    gravity of the harm that he inflicted upon his victim in this

 5    case.  I understand that he had a tough upbringing, but that

 6    gives no one the right to rob someone, in broad daylight, at

 7    gunpoint and steal their car.  There is no justification for

 8    that type of conduct, regardless of one's upbringing or

 9    circumstances.

10             So I do hope that Mr. Spivey later on in life does

11    turn it around again.  Again, I think we all do.  Everybody

12    wants to see that.  Nobody wants to see others fail.  So I do

13    hope that he takes classes when he is in BOP custody.  I think

14    he absolutely has anger management issues.  I think he needs to

15    find a way to deal with those, and I hope that he does.

16             But as far as what the Court is presented with right

17    now, you're seeing a very young man, albeit who just spent

18    four years in prison and 18 days after getting out, he

19    escalates his criminal conduct and commits an armed carjacking.

20    Again, Judge, I think that the top of the guidelines are

21    warranted in this case and necessary.

22             THE COURT:  All right.  Thank you.

23             Mr. Rodriguez.

24             MR. RODRIGUEZ:  Your Honor, I do have the defendant's

25    mother here present who would like to testify.  And, Your
```

```
 1   Honor -- should I put her on the stand first?
 2             THE COURT:  Yes, let's do that.
 3             MR. RODRIGUEZ:  Okay.  Ms. Willis.
 4             Your Honor, is it okay if she stands here?
 5             THE COURT:  Yes.
 6             MR. RODRIGUEZ:  Okay.  Thank you.
 7             THE COURT:  Good morning, ma'am.
 8             THE COURTROOM DEPUTY:  Raise your right hand.
 9         KIMBERLY WILLIS, DEFENDANT'S WITNESS, WAS SWORN
10             MS. WILLIS:  Yes, I do.
11             THE COURTROOM DEPUTY:  Please state your full name
12   for the record and spell it, please.
13             MS. WILLIS:  Kimberly Willis, K-I-M-B-E-R-L-Y, last
14   name is Willis, W-I-L-L-I-S.
15             MR. RODRIGUEZ:  Put your hand down.  Thank you.
16             Ma'am, we've had an opportunity in the last few
17   months to talk about your upbringing of your son.  Could you
18   tell the Court what you're hoping is accomplished as a part of
19   this sentencing and a little bit about his background?
20             MS. WILLIS:  First, I want to say, I was raised in a
21   foster home, and I had Artavis at a young age.  I had --
22   Artavis' daddy was -- just did 20 years.  His daddy is out
23   doing very good, on his feet.
24             I did a lot of things to my son, that I should have
25   been a better parent, and a lot of times you have to fault
```

```
 1   yourself, and I fault myself because I was stealing with

 2   Artavis.  Matter of fact, when I had Artavis, my water bust,

 3   and I was stealing out the store.  I was raised with no momma,

 4   no daddy, and I did the best that I could do for Artavis.

 5           Artavis start hanging around the bad, bad people,

 6   gang-related people.  And being a single parent with six kids

 7   in the home, no education, no money, welfare, I'm trying to

 8   survive, I don't know what to do.  I did the best that I could

 9   do with Artavis.

10           My son is my baby son of my boys.  He is a very, very

11   good child.  I'm not faulting [sic] for what he did because

12   what he did was wrong; and I stand on, if you do wrong, son,

13   you have to be accountable for what you do.  You understand

14   what I'm saying?

15           But my thing is, my son is very low, he's not a

16   fighter.  He can't really fight.  That's my child, I know.  I

17   got two other older boys, and I sit and I listen, but I say

18   this and I say this -- and the reason why I say what I say is

19   that I went to prison.  I went to jail 40 times with my

20   children, my son, but I changed my life.  You understand what

21   I'm saying?  I now work for attorneys.  You understand what I'm

22   saying?  I hang around judges, prosecutors.

23           So I say this, my son, I know he's gonna change

24   because guess what; I'm gonna be there for him.  I'm gonna

25   teach him the ways that I should have been teaching him.
```

```
 1              And I say, I prayed about his situation, and I know
 2    God is in control.  And I'm not mad at the little boy, they
 3    just children.  He doesn't know no better.  But I say this, I
 4    am very, I am very -- when I say -- when I tell you, I am so
 5    sorry to the victims -- I don't know who they are, but I am so
 6    sorry because I don't want nobody to put no gun to me, and I
 7    didn't teach my son to do that, so I don't know where it's
 8    coming from.
 9              But when he came home, I will say this, I seen death
10    all over him.  I don't know what that prison did to my child,
11    but when my child came back home, he was like -- I didn't know
12    who he was.  I was scared to myself to even hug him.  And me
13    and his daddy say it, he ain't ready.  And I fault myself,
14    because they offered him ten years, I should have let him stay,
15    and he would have came out and he would have been ready.
16              But I say be lenient on him and the reason why,
17    prison don't help them.  It really hurts them, it doesn't help.
18              But I'm gonna tell my son this, you take God into
19    prison with you, son, and you go in there and you learn from
20    people in there, and you come out and you be a better man.
21    That's all I can tell you, and you keep God first.
22              I just tell you to have lenient [sic] on him because
23    you see what your parents do.  His daddy went to prison for
24    20 years, that's what he's seen.  His momma went to jail 40
25    times.  But guess what?  His daddy has been out a year, got his
```

1    CDL, got his own trucking business.  Me, I been working for

2    attorneys, not one attorney, Ben Trunc (*phonetic*).  I work for

3    Abercrombie, P.A.  I work for several big-time attorneys, and I

4    hang with judges and prosecutors.  I never thought I could be

5    in a room with them.

6            I go around and I help the community, and I tell them

7    my story.  I have a talk show.  I talked about this situation

8    last night.  I'm in a program with several other mothers that

9    had went down the same road with no momma, no daddy, no

10   nothing.  You got to be there to know.  Like, some kids say,

11   well, I'm a single parent, I didn't have a momma or daddy to go

12   to the pantry, I had to survive and this is how I learned how

13   to survive so -- then I went with -- then, that was not good

14   for me because I had a heart and so that -- they turned my son

15   out because his daddy wasn't there.

16           So I'm not saying, oh, he did -- he supposed to be

17   accountable for what he did.  He did wrong and that's not

18   right; but I'm just telling you that prison don't help them.

19   Giving him all this time is not gonna to help.  He's a young

20   man, he's only 21.  But I say give him -- lenient on him,

21   because I know that my child, I know that my child is gonna

22   come back home and he gonna be that perfect man that I know him

23   to be because his daddy did it and his momma did it, and he

24   listening and he seeing.

25           And I know when my son told me on that phone, he

 1    said, Momma, if I get up out of this, I promise on my

 2    grandma -- and she's not here, she took care of him -- I won't

 3    never get back in this trouble again.

 4            And I just say just have lenient on my child.  That's

 5    it.  I'm asking for mercy, that's all, as a parent.

 6            Thank you.

 7            THE COURT:  Thank you, ma'am.

 8            MR. RODRIGUEZ:  Thank you, Ms. Willis.

 9            Your Honor, I submitted to you a sentencing

10    memorandum.  This is not an easy case, and I don't envy your

11    position.

12            My client began a life of crime at age of 12, and

13    it's unbelievable when I read this and read the history he has

14    been through and what he has done.  Your Honor, he has known no

15    other way.  He was -- had persons in his life that at the age

16    of 12 were teaching him to do exactly what he did when he got

17    out of prison, stealing and taking things from people not

18    really thinking of the consequences of it.  It's an extremely

19    disturbing background.  You would think in this day and age, we

20    would not have those backgrounds of people, that we would have

21    ways to deal with this a little better.

22            And I do apologize to the victim of the crime.  I

23    watched all the evidence and saw what she had to say and the

24    fear she had, and my client does sincerely apologize.  I don't

25    think, as a young person, he really thought of the consequence

1    of the fear he put in persons when you run up to them, grab a

2    car, point a gun at them, and all the collateral consequences

3    that she's had as a result of losing that vehicle or that

4    vehicle being damaged.

5           Your Honor, I believe a sentence at the bottom of the

6    guidelines serves a purpose with additional supervised release.

7    It's not even a very low sentence, it's a very high sentence,

8    161 months.  It's quite a long time.  He won't get out of

9    prison until he's in his 30s, and I'm hoping that perhaps a

10   longer supervised release period gives the Court the ability in

11   the future to just help him get out and become a better person

12   and be supervised more.

13          The difference between the Government's

14   recommendation and our recommendation, which is a

15   recommendation we agreed to in the plea would be within the

16   guidelines, is not really a lot, Your Honor.  We're talking

17   about at least 19 months.

18          So, Your Honor, I'd ask you to really seriously

19   consider his background and what his mother had to say.  She's

20   had a really difficult time with her son.  He did commit this

21   crime 18 days after he got out.  He's had nobody to turn to,

22   really.  He's had no parent figure to really help.

23          When he was in prison, Your Honor, this last time, he

24   was severing a youthful offender sentence and, under state law,

25   they put you with other youthful offenders; but, as I wrote in

```
 1   my memo, COVID knocked out all the programs, so basically he
 2   sat around for years in prison doing nothing, Your Honor, just
 3   hanging with other kids and coming up with ideas of trying to
 4   find drugs and things you can do within the system.  The State
 5   of Florida did nothing to him.  In fact, the State of Florida
 6   has never done anything to help him except just give him
 7   sentences over and over and over again, all short-term.  And
 8   here we are in the federal system with a very serious crime.
 9              So I would ask the Court to at least seriously
10   consider his background and imposing a sentence at the low end
11   of the guidelines, knowing that you can keep supervision of him
12   for five years in addition to whatever term of sentence he has.
13              Thank you, Your Honor.
14              THE COURT:  Thank you.
15              Mr. Porter, anything further?
16              MR. PORTER:  Nothing further from the United States.
17   However, the victim would like to speak to the Court.
18              THE COURT:  All right.
19              MR. PORTER:  Judge, the victim, Jennifer Shiflet, she
20   wrote out what she wanted to say on her phone.  I told her it
21   was okay to have that.  She might need to refer to her phone to
22   see the notes that she wrote out.
23              THE COURT:  That's fine.
24              Good morning, ma'am.
25              Please spell your name for us.
```

1          MS. SHIFLET:  Jennifer Shiflet, J-E-N-N-I-F-E-R,

2    S-H-I-F-L-E-T.

3          THE COURT:  You may proceed.

4          MS. SHIFLET:  Thank you.

5          Thank you for giving me the opportunity today to

6    speak.

7          Nine months ago to the day, my life changed

8    drastically for the worst and not the best.  That day,

9    February 17th, I was having a cigarette on my lunch break from

10   work, sitting in my vehicle with the door open.  I normally

11   don't leave my door open; but that day, the office was so cold,

12   I was letting the sun warm me up.  The next thing I know,

13   you're standing in my driver's seat with a gun pointed at me

14   asking for my keys, my phone and money, and threatening to

15   shoot me if I didn't give it to you.  Because of your selfish

16   actions that day, I was left to deal with the consequences.

17         It took me a long time to feel fairly comfortable

18   driving; but however, to this day, I cannot sit in my car

19   stationary.  I went to a fast-food restaurant one day, I went

20   through the drive-through, they asked me to pull ahead because

21   the order was still being made and someone would bring it out

22   to me; I sat in my car and I ended up having such a bad panic

23   attack, I had to leave.  I left without even getting my food.

24         I'm still trying to deal with that on a daily basis.

25   Driving back and forth to work, driving anywhere, just sitting

1    at a red light, I'm nervous.

2            Unbeknownst to you, I had just gone through a divorce

3    which was finalized in January, and it left me struggling

4    financially, but I was making it and I was doing okay.  You

5    caused I believe over $20,000 in damage to my vehicle.  My

6    insurance company wouldn't total my vehicle unless I had

7    $22,000, so I had to get it repaired, and I had to deal with

8    the fact that I had to drive the same car in which you pointed

9    a gun at me.  So I'm making a car payment on a car that I can't

10   drive, while I'm paying my portion for the rental car.

11           I had to buy a temporary phone because you took my

12   phone, and then the police had it for evidence.  When I did

13   eventually get my phone back, I had to go purchase a new phone

14   because it didn't work properly, while I'm still making my

15   mortgage payment and all my other bills.

16           In June, I was broke.  My vehicle still wasn't

17   repaired.  In fact, my vehicle just got finished being repaired

18   last month.  Eight months it took for me to have that car

19   repaired.

20           I had no other choice but to declare bankruptcy.  So

21   in a matter four months, I went from working and making it on

22   my own, in my mid 50s with a credit score of 780 to 800 to

23   ruining my credit for seven years, working my full-time job,

24   and I have to work two extra side jobs just to make ends meet.

25           And I know you're probably not listening to what I

1    have to say today, but if you are, Mr. Spivey, I want you to

2    take this away with you.  The next time you want to be a thug

3    and ruin somebody else's life, think about today.  Think about

4    what you have put me through and think about what I have to do

5    to overcome everything.

6              You know, there's no easy road in life.  I understand

7    people have challenges.  People are all raised differently, we

8    all have struggles.  The easy road takes you to that seat right

9    there.  With hard work, determination, you can overcome and do

10   anything you can.  I taught my kids that growing up.

11             My kids are the same ages of you and the other

12   codefendants.  My son, he's 19; he's in the Army, he's military

13   police.  My daughter is 22, she's married, lives a responsible

14   life.  There's always a better way, there's better choices.

15   And I hope whatever time the judge decides to give you, you

16   take that time and you use the time constructively and you

17   change.

18             Thank you.

19             THE COURT:  Thank you very much, Ms. Shiflet.

20             Anything further from the Defense?

21             MR. RODRIGUEZ:  No, Your Honor.

22             THE COURT:  Mr. Spivey, you are permitted to make a

23   statement to the Court, if you wish, but you're not required to

24   say anything.

25             MR. RODRIGUEZ:  Your Honor, he just wants to remain

1    with the statement of responsibility he gave you earlier.

2              THE COURT:  All right.  Thank you.

3              I'm going to take a five-minute recess to consider

4    the matters.  We're in recess.

5              THE COURTROOM DEPUTY:  All rise.

6              *(Recess was had at 11:23 a.m.; and the proceedings*

7              *resumed at 11:34 a.m.)*

8              THE COURT:  Thank you.  Please be seated.

9              All right.  Well, this is indeed a very difficult

10   case.  You are a very young man, Mr. Spivey, and clearly you

11   grew up with some very significant challenges.  As I look at

12   the record presented, and I have done so carefully,

13   holistically and in consideration with all of the 3553(a)

14   factors, I am unfortunately presented with a very disturbing

15   picture of someone who through their actions has demonstrated

16   himself to be a real danger to the community, who needs to be

17   deterred from continuing to commit crimes at the expense of the

18   community.

19             I think there's really no question that in a short

20   amount of time, as I said, you're young, you've engaged in a

21   very, very serious pattern of repeated criminal conduct which

22   is, I think, on full display in the PSI; and that conduct has

23   escalated significantly, as we see here, where you are now

24   threatening to kill people with a firearm if they don't submit

25   to your demands for property, all the while inflicting trauma

```
 1    on innocent people in our community; all of this, of course,

 2    just weeks after being released from custody for another

 3    serious crime.

 4            So this is all extremely serious, as I think you

 5    know, Mr. Spivey, and it needs to be deterred both for your

 6    sake as well as for the sake of the community that you

 7    victimize as a result of this crime and the various other

 8    offenses in your history.

 9            Now, of course, I hope that you can turn your life

10    around, as I'm told your father was able to do and your mother

11    was able to do, and I do pray that you can achieve that.  I

12    encourage you to rely on your faith to better yourself in the

13    future.  But unfortunately, your actions have resulted in a

14    significant need for a very significant sentence.

15            The Court has considered the statements of all

16    parties, the presentence report, which contains the advisory

17    guidelines and the statutory factors set forth in Title 18,

18    United States Code, Section 3553(a).  It is the finding of the

19    Court that the defendant is not able to pay a fine, but he will

20    be ordered to pay restitution, as mandatory, in the amount of

21    $3,500.

22            I do want to inquire of the Government:  Are you

23    prepared to finalize restitution at this time?

24            MR. PORTER:  Yes, Judge, that is the -- can I have

25    one second?
```

```
 1            THE COURT:  Yes.
 2            (Break in the proceedings)
 3            MR. PORTER:  Yes, Your Honor, that is the final
 4   amount.
 5            THE COURT:  All right.  Is there any stipulation as
 6   to the restitution amount?  Is that in the plea agreement or is
 7   there any other documentation for that?
 8            MR. PORTER:  It is in the plea agreement, Judge.  If
 9   I'm not mistaken, it's in paragraph 11 of Mr. Spivey's plea
10   agreement.  It is in the plea agreement.  There is -- in both
11   plea agreements in this case, there's a paragraph that concerns
12   restitution.
13            THE COURT:  Yes.  Okay, I see that here.
14            All right.  It is the judgment of the Court that the
15   defendant, Artavis Spivey, is committed to the Bureau of
16   Prisons to be imprisoned for a total of 175 months.  The
17   sentence consists -- I want to get the exact breakdown -- we
18   have the 84 months consecutive on Count 2 --
19            Mr. Vreeland, what would that leave for Count 1?
20            PROBATION OFFICER:  I believe that's 91 months, Your
21   Honor.  Let me just double-check.
22            Yes, Your Honor, 91 months as to Count 1.
23            THE COURT:  So the sentence consists of 91 months as
24   to Count 1, and 84 months as to Count 2 to be served
25   consecutively to Count 1.  I also want to note on the record
```

```
 1   that I would impose the same sentence of 175 months regardless

 2   of any possible error on the application of the obstruction

 3   enhancement.  And I do want to add to my earlier commentary.

 4   That obstructive conduct which, again, evinces a real disregard

 5   for the laws of this country, the fact that you would direct a

 6   codefendant to write a false document in that manner, it is

 7   another example of the need for a significant sentence.

 8           It is further ordered that the defendant shall pay

 9   joint and several restitution with the defendant Daniel Zamot,

10   in the amount of $3500.

11           During the period of incarceration, payment shall be

12   made as follows:  One, if the defendant earns wages in a

13   federal prison industry's job, then the defendant must pay

14   50 percent of wages earned toward the financial obligations

15   imposed by this judgment in a criminal case; two, if the

16   defendant does not work in a UNICOR job, then the defendant

17   must pay a minimum of $25 per quarter toward the financial

18   obligations imposed in this order.

19           Upon release from incarceration, the defendant shall

20   pay restitution at the rate of 10 percent of monthly gross

21   earnings until such time as the Court may alter that payment

22   schedule in the interests of justice.

23           The U.S. Bureau of Prisons, U.S. Probation Office,

24   and U.S. Attorney's Office shall monitor the payment of

25   restitution and report to the Court any material change in the
```

1    defendant's ability to pay.

2          These payments do not preclude the Government from

3    using any other anticipated or unexpected financial gains,

4    assets, or income of the defendant to satisfy restitution

5    obligations.

6          The restitution shall be made payable to the Clerk,

7    United States Courts, and forwarded to the clerk's office at

8    400 North Miami Avenue, in Miami, Florida.  The restitution

9    will be forwarded by the clerk of the court to the victim.

10          Upon release from imprisonment, the defendant shall

11    be placed on supervised release for a period of three years.

12    This sentence consists of three years as to each of Counts 1

13    and 2 to be served concurrently.

14          Within 72 hours of release, the defendant shall

15    report in person to the probation office in the district where

16    released.

17          While on supervised release, the defendant shall

18    comply with the mandatory and standard conditions of supervised

19    release which include not committing any crimes, being

20    prohibited from possessing a firearm or other dangerous device,

21    not unlawfully possessing a controlled substance, and

22    cooperating in the collection of DNA.

23          The defendant also shall comply with the following

24    special conditions:  Association restriction, mental health

25    treatment, substance abuse treatment, employment requirement,

1   permissible search, financial disclosure requirement, and

2   unpaid restitution, fines, or special assessments as noted in

3   part F of the presentence report.

4           It is further ordered that the defendant shall pay

5   immediately to the United States a special assessment of $100

6   as to each count for a total of $200.

7           The total sentence therefore is 175 months

8   imprisonment, three years supervised release, $3500 in

9   mandatory restitution, and a $200 special assessment.

10          Now that sentence has been imposed, does the

11   defendant or his counsel object to the Court's finding of fact

12   or to the manner in which sentence was pronounced?

13          MR. RODRIGUEZ:  Your Honor, we just renew our

14   objection on the obstruction.  Other than that, we have no

15   other objections.

16          THE COURT:  All right.  Thank you.

17          Sir, you have the right to appeal the sentence

18   imposed.  Any notice of appeal must be filed within 14 days

19   after the entry of the judgment.  If you are unable to pay the

20   cost of an appeal, you may apply for leave to appeal in forma

21   pauperis.

22          Is there anything further from the Defense?

23          MR. RODRIGUEZ:  Yes, Your Honor.  We made two

24   recommendations in our sentencing memo.  One was for a location

25   recommendation as well as the RDAP program based upon his

```
 1   substance abuse history.

 2              THE COURT:  And the location that you're requesting

 3   is what?

 4              MR. RODRIGUEZ:  Florida, Coleman, if possible; as

 5   close to family as possible, so maybe Coleman would be the best

 6   recommendation.

 7              THE COURT:  All right.  Well, I don't make facility

 8   specific recommendations, but I will include in the judgment a

 9   recommendation that he be housed in a facility as close to his

10   family in Florida as possible.  And I'll also include the RDAP

11   recommendation.

12              MR. RODRIGUEZ:  Thank you.

13              Your Honor, we also -- paragraph 10 of the plea

14   agreement -- and I'm not sure if this charge still exists, but

15   in the event it does, the Government agreed that this case

16   would run concurrent to any sentence imposed in the State of

17   Florida vs. Artavis Spivey, case number 28-22CF000194,

18   Highlands County.

19              THE COURT:  All right, I'll grant that request, and

20   I'll announce on the record and include in the judgment that

21   this sentence shall run concurrent to any sentence imposed in

22   that case which is stated as case number 28-2022CF000194 out of

23   the Tenth Judicial Circuit in Highlands County.

24              Anything further on that point, Mr. Porter?

25              MR. PORTER:  No, Your Honor.
```

```
 1              THE COURT:  All right.  Anything further from
 2    Probation?
 3              PROBATION OFFICER:  No, Your Honor.  Thank you.
 4              THE COURT:  All right.
 5              Are there any counts to dismiss, Mr. Porter?
 6              MR. PORTER:  Yes, Your Honor.  Count 3, which is the
 7    gun and possession count, the United States moves to dismiss
 8    Count 3 of the indictment.
 9              THE COURT:  All right, count 3 is so dismissed.
10              Mr. Spivey, I really do hope that you can turn your
11    life around.  I have faith in that, and I have faith in you,
12    and I wish not to ever see you again engage in any criminal
13    conduct.  May God bless you.
14              The Court is in recess.
15              MR. RODRIGUEZ:  Thank you, Your Honor.
16              THE COURTROOM DEPUTY:  All rise.
17              (Proceedings adjourned at 11:45 a.m.)
18              C-E-R-T-I-F-I-C-A-T-E
19              I hereby certify that the foregoing is
20         an accurate transcription and proceedings in the
21         above-entitled matter.
22
23    1/5/2023                    /s/DIANE MILLER
      DATE                  DIANE MILLER, RMR, CRR, CRC
                            Official Court Reporter
24                          United States District Court
                            101 South U.S. Highway 1
25                          Fort Pierce, FL  34950
                            772-467-2337
```

Thursday, November 17, 2022.



Thursday, November 17, 2022.

UNITED STATES vs. ARTAVIS SPIVEY

**BY MR. RODRIGUEZ: [1]** 57/18

**MR. PORTER: [40]** 3/7 4/19 5/6 6/6 6/9 12/24 16/12 16/23 17/17 18/11 19/2 20/3 20/16 23/3 36/3 39/3 39/5 39/17 39/20 39/22 41/25 42/9 42/19 43/12 43/15 48/10 52/25 54/21 60/21 61/2 61/17 61/25 64/23 72/16 72/19 77/24 78/3 78/8 82/25 83/6

**MR. RODRIGUEZ: [40]** 3/10 4/14 5/15 5/22 13/3 16/15 17/5 17/20 18/14 19/6 20/6 20/19 23/7 35/25 42/2 42/12 48/14 49/15 50/20 52/6 55/19 56/8 56/19 56/24 57/22 60/15 60/24 61/15 65/24 66/3 66/6 66/15 70/8 75/21 75/25 81/13 81/23 82/4 82/12 83/15

**MS. SHIFLET: [2]** 73/1 73/4

**MS. WILLIS: [3]** 66/10 66/13 66/20

**PROBATION OFFICER: [4]** 3/15 60/2 78/20 83/3

**THE COURT: [89]**

**THE COURTROOM DEPUTY: [12]** 3/3 6/14 6/16 40/3 40/6 40/11 57/3 57/6 66/8 66/11 76/5 83/16

**THE WITNESS: [5]** 6/19 40/5 40/9 40/12 42/5

**$**

**$100 [1]** 81/5
**$20,000 [1]** 74/5
**$200 [3]** 61/12 81/6 81/9
**$22,000 [1]** 74/7
**$25 [1]** 79/17
**$3,500 [1]** 77/21
**$300,000 [1]** 61/10
**$3500 [3]** 61/11 79/10 81/8

**/**

**/s/DIANE [1]** 83/22

**1**

**1/5/2023 [1]** 83/22
**10 [1]** 82/13
**10 percent [1]** 79/20
**101 [2]** 1/15 83/24
**11 [1]** 78/9
**11:23 [1]** 76/6
**11:34 [1]** 76/7
**11:45 [1]** 83/17
**11th [10]** 25/25 26/12 27/1 27/4 27/5 27/6 27/7 27/8 27/11 38/19
**12 [2]** 70/12 70/16
**13th [5]** 26/23 27/14 28/2 28/9 28/12
**14 days [1]** 81/18
**161 [1]** 60/10
**161 months [1]** 71/8
**17 [1]** 1/4
**175 months [3]** 78/16 79/1 81/7
**17th [2]** 7/6 73/9
**18 [5]** 3/23 3/24 4/2 4/3 77/17
**18 days [4]** 63/16 64/1 65/18 71/21
**180 months [5]** 60/10 62/1 62/2

64/17 64/25
**19 [1]** 75/12
**19 months [1]** 71/17
**1996 [1]** 45/11

**2**

**20 years [2]** 66/22 68/24
**2022 [22]** 1/4 7/7 25/25 26/13 26/20 26/23 27/1 27/4 28/2 28/10 28/12 30/2 30/14 31/9 34/14 34/17 34/20 34/23 35/4 35/15 35/22 48/18
**2022CF000194 [1]** 82/22
**2023 [1]** 83/22
**20th [1]** 30/2
**21 [2]** 63/11 69/20
**21 years [1]** 63/6
**2119 [1]** 3/24
**22 [1]** 75/13
**22-14026-CR-CANNON [1]** 1/2
**22-CR-14026-Cannon [1]** 3/4
**22CF000194 [1]** 82/17
**22nd [7]** 21/2 34/20 34/23 35/3 35/15 48/18 50/1
**23 [1]** 2/5
**2337 [2]** 1/25 83/25
**24 [3]** 60/6 60/6 61/5
**2465 [1]** 1/18
**24th [3]** 34/14 34/16 35/22

**3**

**30 seconds [2]** 31/14 31/18
**30,000 [1]** 61/10
**301 [1]** 1/19
**30s [1]** 71/9
**3100 [1]** 1/15
**32 [3]** 5/18 5/23 42/15
**33401 [1]** 1/19

**34 [1]** 60/4
**34950 [2]** 1/16 83/25
**3553 [7]** 62/3 62/4 63/2 63/3 64/15 76/13 77/18
**36 [3]** 2/6 6/1 60/5
**3C1.1 [3]** 5/24 42/16 58/6

**4**

**40 [3]** 2/8 67/19 68/24
**400 [1]** 80/8
**45 minutes [1]** 22/15
**467-2337 [1]** 1/25

**5**

**50 percent [1]** 79/14
**50s [1]** 74/22
**57 [1]** 2/10

**7**

**72 hours [1]** 80/14
**77 [2]** 60/8 61/6
**772 [1]** 1/25
**772-467-2337 [1]** 83/25
**780 [1]** 74/22

**8**

**800 [1]** 74/22
**84 months [3]** 61/8 78/18 78/24
**84-month [1]** 60/8

**9**

**91 months [3]** 78/20 78/22 78/23
**924 [1]** 4/3
**96 [1]** 1/7
**96 months [1]** 60/8
**96 months' [1]** 61/7

**A**

**a.m [3]** 76/6 76/7 83/17
**Abercrombie, [1]** 69/3

**Abercrombie, P.A [1]** 69/3
**ability [5]** 44/18 44/19 53/19 71/10 80/1
**about at [1]** 71/17
**above [1]** 83/21
**above-entitled [1]** 83/21
**absolutely [3]** 46/18 62/19 65/14
**abuse [2]** 80/25 82/1
**accept [1]** 57/19
**acceptance [11]** 5/25 54/15 54/18 55/18 55/18 56/16 56/17 57/13 59/17 59/18 61/21
**accepting [2]** 29/13 55/22
**accident [1]** 34/19
**accomplished [1]** 66/18
**according [3]** 47/6 49/14 49/25
**accountable [2]** 67/13 69/17
**accuracy [1]** 48/15
**achieve [1]** 77/11
**across [1]** 21/15
**act [1]** 62/14
**actions [4]** 53/21 73/16 76/15 77/13
**add [2]** 54/19 79/3
**addendum [1]** 4/9
**addition [1]** 72/12
**adequate [2]** 62/7 64/5
**adhere [1]** 43/13
**adjourned [1]** 83/17
**adjudicated [1]** 4/4
**adjusted [1]** 60/3
**adjustment [2]** 56/13 61/20
**administration [3]** 43/7 45/9 46/7
**admission [1]**

UNITED STATES vs. ARTAVIS SPIVEY

**A**

admission... [1]
19/4
admitted [15]
16/16 16/18 17/21
17/23 18/15 18/17
19/7 19/9 20/7
20/9 20/20 20/22
30/10 30/15 58/14
adopt [1] 61/20
advancing [1]
54/7
advisory [4] 61/6
61/9 61/19 77/16
afraid [6] 16/5
31/4 32/15 32/21
32/25 33/11
age [5] 63/11
66/21 70/12 70/15
70/19
Agent [1] 26/2
Agent
  Christopher [1]
26/2
agents [9] 26/5
27/14 28/1 31/9
31/16 31/20 31/23
33/2 51/8
ages [1] 75/11
agreement [11]
4/10 7/14 7/17
54/22 54/23 54/24
78/6 78/8 78/10
78/10 82/14
agreements [1]
78/11
AILEEN [1] 1/10
albeit [2] 58/9
65/17
allegation [2]
51/23 55/21
alleged [1] 56/2
allegedly [1]
32/25
allotted [1] 3/19
allow [1] 62/25
allowing [1]
55/23
almost [1] 10/10
alone [2] 43/2
47/9
alter [1] 79/21

altercation [2]
12/3 12/3
altered [1] 43/21
although [3] 59/5
59/19 61/10
amassed [1] 63/7
AMERICA [1] 1/3
amount [5] 76/20
77/20 78/4 78/6
79/10
analysis [1] 51/15
anger [1] 65/14
announce [1]
82/20
answer [2] 35/10
41/14
anticipated [2]
4/17 80/3
anticipation [2]
4/6 4/12
apartment [1]
9/21
apologize [2]
70/22 70/24
appeal [4] 81/17
81/18 81/20 81/20
appearance [2]
3/5 21/14
APPEARANCES
  [1] 1/13
applicable [1]
61/4
application [27]
39/11 43/16 43/17
43/20 44/6 44/24
45/2 45/12 45/12
45/18 45/19 45/21
45/22 46/5 47/11
47/12 47/16 48/1
54/1 54/2 54/4
54/4 54/6 54/11
58/19 59/15 79/2
applies [7] 43/19
44/22 45/13 45/18
45/22 47/11 55/12
apply [4] 42/21
45/10 48/2 81/20
appreciate [1]
52/22
approached [1]
26/17
argue [1] 51/20
argument [9]

39/10 42/12 42/17
43/4 48/4 52/23
54/14 61/22 64/20
arguments [1]
57/24
armed [4] 7/5
7/11 63/16 65/19
Army [1] 75/12
arrested [1] 7/6
ARTAVIS [58] 1/6
2/9 3/4 7/23 10/12
10/21 10/23 11/3
11/23 12/12 12/17
14/6 14/12 15/1
15/4 15/7 16/9
20/1 21/3 21/9
22/13 22/25 37/20
37/24 42/25 43/2
43/24 44/2 44/11
44/14 44/15 44/20
45/15 46/3 46/8
46/9 46/14 46/16
46/21 47/1 47/3
47/5 47/7 47/22
53/2 53/6 53/8
53/15 57/5 62/9
66/21 67/2 67/2
67/4 67/5 67/9
78/15 82/17
Artavis' [1] 66/22
assaulted [5]
22/14 27/22 28/2
28/4 46/14
assaulting [2]
28/16 28/17
assessment [3]
61/12 81/5 81/9
assessments [1]
81/2
assets [1] 80/4
assigned [1]
14/16
assist [1] 24/7
Association [1]
80/24
attack [1] 73/23
attempt [5] 45/8
50/22 50/23 51/12
54/10
attempted [4]
43/6 46/8 48/7
59/2
attempting [9]

43/21 44/7 45/15
46/1 46/3 50/14
50/16 50/16 50/17
attempts [2]
45/13 51/15
attorney [8] 1/14
23/12 38/22 38/23
38/25 41/17 44/18
69/2
Attorney's [2]
62/23 79/24
attorneys [3]
67/21 69/2 69/3
AUSA [1] 1/14
author [1] 58/11
Avenue [2] 1/18
80/8
avoiding [1]
55/15
Avon [1] 14/10

**B**

baby [1] 67/10
backdrop [1]
42/20
background [4]
66/19 70/19 71/19
72/10
backgrounds [1]
70/20
bankruptcy [1]
74/20
basis [1] 73/24
basketball [5] 8/1
8/2 8/7 8/10 9/11
Beach [13] 1/19
11/8 11/9 11/17
11/20 26/24 27/5
27/7 27/12 27/15
28/13 28/20 39/1
behest [1] 47/5
believer [1] 64/23
Ben [1] 69/2
benefit [3] 23/20
52/11 59/21
benefits [2] 46/20
52/11
big-time [1] 69/3
bills [1] 74/15
black [2] 8/14 9/9
bless [1] 83/13
body [2] 43/5
48/5

book [1] 33/22
BOP [1] 65/13
bottom [2] 13/17
71/5
boy [2] 12/8 68/2
boys [2] 67/10
67/17
brandishes [1]
62/18
brandishing [1]
4/1
breakdown [1]
78/17
Brief [2] 13/24
39/4
broad [3] 62/10
63/23 65/6
burden [2] 48/2
58/5
Bureau [2] 78/15
79/23
burglaries [1]
63/20
burglarize [1]
37/8
burglarized [1]
63/10
burglary [4] 36/12
63/7 63/8 63/8
business [2]
62/11 69/1
bust [1] 67/2

**C**

C-E-R-T-I-F-I-C-A-
T-E [1] 83/18
C-L-A-R-A [1]
40/12
calculated [1]
61/19
calculations [1]
61/4
callous [1] 62/14
CANNON [3] 1/2
1/10 3/4
car [17] 8/23 8/25
10/14 10/16 10/23
62/11 62/17 63/24
65/7 71/2 73/18
73/22 74/8 74/9
74/9 74/10 74/18
cards [3] 33/12
33/17 52/17

# C

carefully [1] 76/12
carjacking [15] 3/23 7/5 7/11 8/3 8/4 8/16 8/19 8/20 8/21 10/12 36/15 36/20 36/21 63/16 65/19
cars [1] 63/21
category [4] 45/14 48/8 60/7 61/5
category IV [1] 61/5
CDL [1] 69/1
cell [8] 27/22 28/2 28/5 31/13 31/17 32/19 32/21 32/24
certify [1] 83/19
chaining [1] 12/8
chair [1] 17/11
challenges [2] 75/7 76/11
challenging [1] 64/21
characteristics [1] 63/5
charge [2] 37/21 82/14
charged [7] 30/12 30/24 31/1 31/4 31/6 36/10 43/25
charges [7] 3/22 3/25 7/4 7/6 7/11 7/12 45/17
chase [1] 63/25
child [7] 67/11 67/16 68/10 68/11 69/21 69/21 70/4
children [2] 67/20 68/3
choice [5] 33/17 33/19 33/19 33/21 74/20
choices [1] 75/14
Christopher [1] 26/2
cigarette [1] 73/9
Circuit [4] 45/7 45/11 50/6 82/23
circumstances [9] 51/3 53/17 54/11

55/24 59/19 62/5 62/8 65/3 65/9
cite [3] 44/5 45/10 47/13
cities [1] 62/22
citing [1] 50/5
claimed [2] 24/2 27/21
Clara [6] 2/7 4/25 39/22 40/4 40/9 40/12
classes [1] 65/13
classify [1] 63/20
clear [3] 33/23 42/14 63/9
clerk [10] 14/14 15/7 15/10 25/6 38/4 38/5 49/10 58/17 80/6 80/9
clerk's [1] 80/7
client [7] 51/13 56/3 56/9 56/20 56/24 70/12 70/24
clip [3] 8/14 9/9 9/9
close [3] 57/8 82/5 82/9
Code [5] 3/23 3/24 4/2 4/3 77/18
codefendant [11] 4/20 43/11 45/25 46/2 47/15 49/4 50/2 50/16 53/13 58/8 79/6
codefendants [2] 51/5 75/12
coerce [2] 44/8 46/4
coins [2] 37/5 37/7
cold [1] 73/11
Coleman [2] 82/4 82/5
collateral [1] 71/2
collection [1] 80/22
combining [1] 61/12
comfortable [1] 73/17
commentary [7] 43/11 50/14 51/16 56/12 58/20 59/11

79/3
Commission [1] 43/18
commit [2] 71/20 76/17
commits [2] 45/13 65/19
committed [3] 63/9 63/15 78/15
committing [3] 43/25 50/17 80/19
commonplace [1] 62/25
community [5] 69/6 76/16 76/18 77/1 77/6
company [1] 74/6
competent [3] 51/13 51/14 51/17
complex [1] 55/25
comply [2] 80/18 80/23
concern [1] 64/8
concerns [1] 78/11
conclusion [1] 8/21
concurrent [2] 82/16 82/21
concurrently [1] 80/13
conditions [2] 80/18 80/24
conduct [20] 42/22 43/16 43/19 45/4 45/4 45/22 48/7 54/8 58/14 58/20 59/11 59/20 62/24 64/14 65/8 65/19 76/21 76/22 79/4 83/13
conform [1] 64/14
confront [4] 31/11 31/24 32/2 32/3
confronted [1] 31/21
confusion [1] 59/6
connected [1] 51/13

consecutive [3] 60/9 61/7 78/18
consecutively [1] 78/25
consequence [1] 70/25
consequences [5] 45/17 62/12 70/18 71/2 73/16
consideration [1] 76/13
consistent [3] 44/24 47/21 47/22
consists [3] 78/17 78/23 80/12
constructively [1] 75/16
contain [2] 54/2 54/5
contains [2] 5/23 77/16
context [2] 53/2 54/22
continuing [1] 76/12
contrast [1] 58/23
control [1] 68/2
controlled [1] 80/21
conveyed [1] 59/12
conviction [2] 39/16 43/9
convictions [1] 63/7
convince [1] 28/23
cooperate [3] 7/17 44/3 53/8
cooperating [1] 53/13 80/22
cooperation [1] 7/21
Corrections [1] 63/17
corroborates [2] 46/22 47/19
corroborating [2] 46/16 47/10
corroboration [1] 47/4
count [17] 3/22 3/25 60/8 60/9

61/6 61/8 78/18 78/19 78/22 78/24 78/24 78/25 81/6 83/6 83/7 83/8 83/9
Count 1 [6] 60/8 61/6 78/19 78/22 78/24 78/25
Count 2 [4] 60/9 61/8 78/18 78/24
Count 3 [2] 83/6 83/8
Count one [1] 3/22
count two [1] 3/25
counterfeit [1] 43/21
counties [1] 63/25
country [1] 79/5
counts [5] 3/22 61/9 61/12 80/12 83/5
Counts 1 [3] 61/9 61/12 80/12
counts one [1] 3/22
county [29] 11/8 11/9 11/14 11/15 11/16 11/17 11/19 11/20 11/24 19/24 20/25 21/10 25/9 25/19 25/20 27/9 27/12 28/13 28/20 38/13 39/1 40/25 41/3 46/25 55/25 58/4 59/9 82/18 82/23
court [57] 1/1 1/24 4/12 8/1 8/2 8/7 8/10 9/11 14/14 15/8 15/10 16/23 21/14 25/5 28/23 29/16 29/18 32/18 35/23 38/4 38/5 45/19 46/10 48/5 48/14 48/16 48/24 48/25 49/10 50/23 50/24 51/1 51/5 51/18 52/18 54/21 56/10 57/12 58/16 58/18 59/16

**C**

court... [16]  59/19
65/16 66/18 71/10
72/9 72/17 75/23
77/15 77/19 78/14
79/21 79/25 80/9
83/14 83/23 83/24
**Court's [3]**  60/14
60/16 81/11
**courthouse [1]**
26/1
**courtroom [4]**  5/4
21/15 40/17 58/10
**Courts [1]**  80/7
**covered [3]**  43/16
45/3 58/20
**COVID [1]**  72/1
**CR [2]**  1/2 3/4
**crash [1]**  12/8
**crashes [1]**  64/1
**crashing [1]**
10/25
**crazy [1]**  9/19
**CRC [1]**  83/23
**create [1]**  53/5
**creates [1]**  52/7
**credibility [2]**
53/1 58/9
**credible [3]**  51/1
51/6 58/16
**credit [4]**  55/14
61/21 74/22 74/23
**crime [10]**  4/1
43/25 62/16 63/12
70/12 70/22 71/21
72/8 77/3 77/7
**crimes [4]**  63/18
64/9 76/17 80/19
**criminal [6]**  60/7
61/5 65/19 76/21
79/15 83/12
**cross [4]**  2/5
23/10 44/19 48/19
**cross-examinatio
n [2]**  23/10 48/19
**cross-examine [1]**
44/19
**CRR [2]**  1/24
83/23
**crying [1]**  41/10
**custody [4]**  7/9
63/16 65/13 77/2

**D**

**daddy [10]**  66/22
66/22 67/4 68/13
68/23 68/25 69/9
69/11 69/15 69/23
**daily [1]**  73/24
**damage [1]**  74/5
**damaged [1]**  71/4
**danger [1]**  76/16
**dangerous [2]**
14/11 80/20
**Daniel [31]**  2/3
4/20 6/9 6/15 6/19
13/18 13/20 40/22
42/25 43/1 44/3
44/12 44/14 44/17
44/19 45/15 46/2
46/4 46/9 46/11
46/17 46/19 46/22
47/1 47/2 47/5
47/6 47/7 47/9
62/10 79/9
**daughter [1]**
75/13
**daylight [3]**  62/10
63/23 65/6
**death [1]**  68/9
**decided [3]**  8/19
8/20 8/23
**decides [1]**  75/15
**decision [4]**  8/21
52/4 55/6 56/3
**declare [1]**  74/20
**declined [3]**  8/8
52/3 58/18
**defeats [1]**  58/19
**defendant [32]**
1/7 1/18 3/11
39/13 43/6 45/7
45/13 50/2 55/9
55/14 56/12 56/23
57/5 61/21 63/6
64/9 77/19 78/15
79/8 79/9 79/12
79/13 79/16 79/16
79/19 80/4 80/10
80/14 80/17 80/23
81/4 81/11
**defendant's [3]**
65/24 66/9 80/1
**Defense [5]**  4/8
44/19 64/19 75/20

81/22
**demands [1]**
76/25
**demonstrated [1]**
76/15
**denial [1]**  5/24
**department [3]**
25/16 25/18 63/17
**departures [1]**
52/12
**depicted [1]**
16/22
**depravity [1]**
62/14
**deputies [1]**
25/20
**derives [1]**  42/16
**despite [2]**  32/24
33/11
**details [2]**  30/19
49/1
**determination [1]**
75/9
**determined [1]**
55/23
**deterred [2]**
76/17 77/5
**deterrence [3]**
62/7 64/5 64/6
**device [1]**  80/20
**diane [4]**  1/24
1/25 83/22 83/23
**difference [1]**
71/13
**difficult [2]**  71/20
76/9
**direct [7]**  2/4 2/8
2/10 6/20 37/18
40/13 79/5
**directed [5]**  42/25
44/14 47/22 58/11
58/17
**direction [1]**
12/13
**disagree [1]**
60/13
**disclosure [1]**
81/1
**Discussion [1]**
56/22
**dismiss [2]**  83/5
83/7
**dismissed [1]**

83/9
**display [1]**  76/22
**disputed [1]**
54/15
**disregard [1]**
79/4
**district [6]**  1/1 1/1
1/11 62/23 80/15
83/24
**districts [1]**  62/21
**disturbing [2]**
70/19 76/14
**divorce [1]**  74/2
**DNA [1]**  80/22
**document [5]**
13/6 43/21 51/21
52/7 79/6
**documentary [1]**
58/2
**documentation
[1]**  78/7
**dorm [5]**  11/22
11/23 12/2 14/20
16/9
**dormitory [6]**
20/1 21/4 21/10
47/2 53/6 53/13
**double [1]**  78/21
**double-check [1]**
78/21
**downward [1]**
52/12
**drafted [1]**  58/3
**drafting [1]**  59/7
**drastically [1]**
73/8
**dressed [2]**  8/17
8/17
**drive-through [1]**
73/20
**driver's [1]**  73/13
**Drove [1]**  10/24
**dude [3]**  14/20
14/22 23/22

**E**

**earned [1]**  79/14
**earnings [1]**
79/21
**earns [1]**  79/12
**easiest [3]**  45/1
45/19 47/12
**easy [3]**  70/10

75/6 75/8
**education [1]**
67/7
**efforts [1]**  50/8
**Eight [1]**  74/18
**Eight months [1]**
74/18
**Eighth [1]**  50/5
**Eleventh [2]**  45/7
45/11
**elocute [1]**  5/8
**else's [1]**  75/3
**employment [1]**
80/25
**encourage [1]**
77/12
**enemies [1]**
33/10
**enforcement [2]**
11/1 63/24
**engage [2]**  54/10
83/12
**engaged [1]**
76/20
**enhancement [30]**
5/17 6/3 6/8
39/11 39/13 39/14
42/8 42/11 42/15
43/3 43/19 44/6
44/10 44/22 44/25
45/9 45/23 46/7
47/11 47/17 47/24
50/7 53/23 54/12
55/12 58/2 58/6
58/19 59/15 79/3
**enhancements [1]**
42/21
**enormous [1]**
62/13
**enter [7]**  7/14
29/4 29/8 29/11
34/1 34/3 56/3
**enters [3]**  50/2
50/4 56/12
**entirely [1]**  44/23
**entitled [3]**  55/4
56/13 83/21
**entry [1]**  81/19
**envy [1]**  70/10
**error [1]**  79/2
**escalated [1]**
76/23
**escalates [1]**

**E**

escalates... [1]
65/19
ESQ [1]  1/18
establish [2]
48/16 48/20
establishing [1]
49/17
eternal [1]  64/24
event [2]  10/7
82/15
events [1]  30/6
Everybody [1]
65/11
evidence [39]
4/18 6/5 13/10
16/13 16/18 17/2
17/18 17/23 18/12
18/17 19/3 19/9
20/4 20/9 20/17
20/22 20/22 42/8
42/10 46/16 47/10
48/3 48/16 48/22
49/7 49/8 49/9
49/17 49/23 50/25
51/2 51/13 51/14
51/18 54/15 56/16
59/1 70/23 74/12
evinces [1]  79/4
examination [7]
6/20 23/10 36/4
37/18 40/13 48/19
57/10
examine [1]
44/19
examples [6]
43/16 48/6 58/20
58/20 58/23 59/11
exchange [1]
7/20
excuse [1]  25/25
excused [3]  39/8
39/9 42/6
Exhibit 1 [2]
16/13 16/16
Exhibits 2 [1]
16/24
exists [1]  82/14
exonerate [3]
43/24 45/16 66/4
exonerating [3]
43/2 44/15 47/15

expense [1]
76/17
explicitly [1]
58/22
extended [2]  8/14
9/9
extent [1]  65/2
extra [1]  74/24
extremely [2]
70/18 77/4

**F**

F-L-O-R-E-S [1]
40/12
face [1]  45/17
faces [1]  64/10
facility [6]  11/10
26/20 53/3 53/7
82/7 82/9
fact [23]  12/12
22/11 25/8 30/22
32/24 33/11 36/12
43/1 44/1 46/23
47/5 47/20 49/3
53/15 58/18 63/15
64/9 67/2 72/5
74/8 74/17 79/5
81/11
factors [7]  62/4
62/4 63/2 63/3
64/16 76/14 77/17
facts [3]  47/25
55/12 55/20
factual [1]  4/10
fail [1]  65/12
failed [1]  48/16
faith [3]  77/12
83/11 83/11
falls [1]  45/14
false [10]  43/21
43/24 44/8 44/15
46/4 47/15 50/17
58/14 59/2 79/6
falsely [3]  43/2
45/16 58/12
family [12]  9/1
10/22 12/7 12/11
14/5 14/6 16/4
16/5 46/10 46/17
82/5 82/10
fast [1]  73/19
fast-food [1]
73/19

father [1]  77/10
fault [3]  66/25
67/1 68/13
faulting [1]  67/11
FBI [3]  21/17
27/15 30/14
fear [5]  33/14
33/15 59/13 70/24
71/1
fearful [5]  52/16
52/19 53/2 53/17
53/22
February 17th [2]
7/6 73/9
federal [2]  72/8
79/13
felonies [1]  63/20
felony [1]  63/7
fight [3]  31/11
31/21 67/16
fighter [1]  67/16
figure [1]  71/22
final [2]  31/10
78/3
finalize [1]  77/23
finalized [1]  74/3
finally [4]  20/11
45/21 46/22 47/18
financial [4]
79/14 79/17 80/3
81/1
financially [1]
74/4
findings [1]  58/7
finished [2]  13/23
74/17
firearm [11]  4/1
8/12 8/14 9/6 9/8
9/10 10/16 62/19
63/8 76/24 80/20
firearms [3]  8/9
10/8 63/11
fit [1]  48/7
fits [1]  46/5
five days [2]  8/3
8/4
five years [2]
61/9 72/12
five-minute [1]
76/3
FL [1]  83/25
Flores [9]  2/7
4/25 39/22 39/23

40/4 40/9 40/12
40/24 42/3
FLORIDA [12]  1/1
1/6 1/16 1/19
62/24 63/17 72/5
72/5 80/8 82/4
82/10 82/17
Florida vs [1]
82/17
flouting [1]  64/7
flsd.uscourts.gov
's [1]  1/25
focus [3]  5/12
39/12 51/17
food [2]  73/19
73/23
foregoing [1]
83/19
forma [1]  81/20
FORT [8]  1/6 1/16
8/22 10/24 11/13
14/21 27/1 83/25
forwarded [2]
80/7 80/9
foster [1]  66/21
fought [3]  31/14
31/17 32/4
four months [1]
74/21
four years [5]
63/19 63/21 64/12
64/12 65/18
four-year [2]
63/18 64/2
free [1]  37/23
friend [1]  8/22
friends [2]  33/5
33/7
front [4]  12/22
18/4 35/22 61/1
fulfill [1]  56/25
full-time [1]  74/23

**G**

gains [1]  80/3
gallery [1]  42/4
games [1]  53/16
gang [2]  8/8 67/6
gang-related [1]
67/6
general [2]  62/7
64/5
gets [2]  63/22

64/1
gives [4]  52/7
60/5 65/6 71/10
God [4]  68/2
68/18 68/21 83/13
gold [2]  37/5 37/7
gonna [9]  9/1
12/11 67/23 67/24
67/24 68/18 69/19
69/21 69/22
Government [33]
3/6 6/15 13/10
16/18 17/2 17/18
17/21 17/23 18/17
19/9 35/2 35/9
35/12 42/18 48/2
48/16 49/14 49/16
49/19 50/10 51/3
51/10 52/24 54/17
54/19 54/23 58/5
60/19 61/1 61/24
77/22 80/2 82/15
Government 2 [1]
17/21
Government's
[26]  4/9 12/25
16/13 16/16 16/24
18/1 18/12 18/13
18/15 18/19 19/3
19/5 19/7 19/11
20/4 20/7 20/9
20/11 20/17 20/20
37/18 40/4 44/12
55/22 59/10 71/13
Government's 3
[1]  18/13
Government's 4
[1]  19/5
grab [1]  71/1
grandma [1]  70/2
grant [2]  59/17
82/19
granted [2]  13/4
17/6
gravity [1]  65/4
Green [7]  14/20
14/22 17/16 18/7
23/23 24/9 24/18
grew [1]  76/11
gross [2]  63/12
79/20
growing [1]  75/10
guideline [17]

## G

**guideline... [17]**
39/16 42/16 43/5
43/14 48/6 57/25
58/23 59/25 60/7
60/9 60/14 60/16
61/6 61/19 63/1
63/4 64/17
**guidelines [9]**
46/6 56/5 60/20
62/3 65/20 71/6
71/16 72/11 77/17
**guilt [1]** 37/21
**guilty [33]** 3/21
4/4 7/13 29/1 29/4
29/6 29/7 29/8
29/11 34/1 34/3
34/4 34/6 34/7
34/9 34/12 34/16
34/25 35/22 44/1
44/11 50/2 50/4
55/9 55/15 56/3
56/13 56/15 56/17
59/4 59/5 59/8
59/21
**gun [6]** 10/9 68/6
71/2 73/13 74/9
83/7
**gunpoint [3]**
62/10 63/23 65/7
**guns [1]** 63/21

## H

**handcuffs [1]** 7/1
**handwriting [1]**
13/12
**hang [2]** 67/22
69/4
**hanging [2]** 67/5
72/3
**harm [1]** 65/4
**harmed [2]** 16/4
16/5
**health [1]** 80/24
**hearing [6]** 1/10
4/5 4/7 4/13 49/6
55/1
**heart [3]** 44/21
46/6 69/14
**heels [1]** 44/2
**here's [1]** 44/10
**hereby [1]** 83/19
**high-speed [1]**

63/25
**Highlands [3]**
25/9 82/18 82/23
**Highway [2]** 1/15
83/24
**hinder [7]** 42/23
45/5 49/2 50/11
50/12 52/10 54/8
**hindered [2]**
39/14 49/18
**hindering [1]**
51/7
**hindrance [10]**
49/19 49/20 49/22
50/5 50/7 50/9
50/21 50/22 53/24
58/22
**history [6]** 60/7
61/5 63/5 70/13
77/8 82/1
**hog [1]** 22/14
**hog-tied [1]** 22/14
**holding [4]** 18/8
18/9 20/13 23/15
**holistically [1]**
76/13
**holistically and
[1]** 76/13
**home [6]** 37/8
66/21 67/7 68/9
68/11 69/22
**Honor [69]** 3/7
3/10 3/15 4/14
4/19 4/22 4/23 5/6
5/15 5/18 6/6 13/3
16/15 17/1 17/5
17/20 23/7 23/8
35/25 42/2 42/9
42/12 42/25 45/2
48/14 49/24 51/15
52/1 52/6 52/14
55/1 55/2 55/19
55/20 56/8 56/20
56/24 60/2 60/10
60/15 60/21 60/24
61/2 61/15 61/17
62/13 65/24 66/1
66/4 70/9 70/14
71/5 71/16 71/18
71/23 72/2 72/13
75/21 75/25 78/3
78/21 78/22 81/13
81/23 82/13 82/25

83/3 83/6 83/15
**HONORABLE [1]**
1/10
**hope [9]** 64/21
64/23 65/1 65/10
65/13 65/15 75/15
77/9 83/10
**hopefully [1]**
64/24
**hoping [3]** 29/22
66/18 71/9
**hospital [1]** 10/3
**hours [1]** 80/14
**house [13]** 8/18
23/23 37/1 37/2
37/3 37/4 37/6
37/11 37/12 37/12
37/13 37/15 47/6
**housed [9]** 11/7
19/23 21/4 34/25
35/1 47/1 53/3
53/7 82/9
**houses [2]** 36/16
36/16
**housing [1]** 35/1
**hug [1]** 68/12
**hurry [1]** 16/2
**hurt [4]** 9/1 10/22
12/7 12/11
**hurts [1]** 68/17

## I

**ii [1]** 4/3
**Imagine [1]** 62/16
**immediately [1]**
81/5
**impact [6]** 42/23
44/16 45/5 53/25
54/9 59/25
**impede [2]** 43/7
45/8
**impeded [1]** 43/6
**impose [2]** 59/16
79/1
**imposed [6]**
79/15 79/18 81/10
81/18 82/16 82/21
**imposing [1]**
72/10
**impress [1]** 64/13
**imprisoned [1]**
78/16
**imprisonment [4]**

61/7 62/1 80/10
81/8
**improper [1]** 50/7
**incarcerated [5]**
7/2 7/4 11/6 33/8
35/6
**incarceration [2]**
79/11 79/19
**incident [11]** 22/1
22/4 25/8 25/13
25/23 25/24 30/6
35/3 35/18 38/12
52/18
**income [1]** 80/4
**inconsistent [2]**
53/16 53/22
**increase [4]** 5/18
5/19 5/24 43/9
**indeed [1]** 76/9
**INDEX [1]** 2/1
**indicia [1]** 56/17
**indictment [3]**
3/22 3/25 83/8
**indirectly [2]**
45/25 49/13
**individual [1]**
24/1
**individuals [1]**
46/14
**industry's [1]**
79/13
**inflicted [1]** 65/4
**inflicting [1]**
76/25
**influence [1]**
43/10
**influencing [2]**
45/24 50/15
**information [2]**
38/9 53/9
**initial [1]** 21/14
**inmate [1]** 32/20
**inmates [2]** 31/11
31/24
**innocent [1]** 77/1
**inquire [2]** 5/4
77/22
**instances [1]**
46/11
**instant [3]** 43/8
48/9 63/9
**instructing [1]**
47/7

**instructions [2]**
24/20 24/25
**insufficient [1]**
64/13
**insurance [1]**
74/6
**intend [3]** 4/21
4/25 54/23
**intended [1]** 44/3
**intends [1]** 4/20
**intentions [1]**
31/19
**interactions [1]**
30/19
**interests [1]**
79/22
**interview [14]**
21/18 25/10 25/12
25/24 26/1 26/23
27/4 30/3 30/5
30/8 30/15 30/15
30/16 31/10
**interviewed [2]**
25/8 25/15
**interviews [2]**
30/20 30/23
**intimidating [1]**
45/24
**introduce [2]**
4/21 6/5
**introduced [1]**
49/23
**investigation [16]**
4/8 39/15 42/23
43/8 43/22 43/23
45/5 48/8 49/1
49/3 49/18 49/20
51/7 54/9 58/22
59/3
**involvement [3]**
25/13 26/5 27/18
**issue [2]** 42/22
54/8
**issues [2]** 58/9
65/14
**items [1]** 37/2
**IV [1]** 61/5

## J

**J-E-N-N-I-F-E-R
[1]** 73/1
**jail [44]** 11/7 11/8
11/9 11/14 11/15

**J**

jail... [39]  11/16
11/17 11/19 11/20
11/24 14/23 15/14
15/16 15/24 19/24
20/25 21/10 22/1
22/4 23/1 23/23
23/23 24/1 26/24
27/2 27/9 27/12
28/13 28/20 33/8
33/13 33/18 34/8
38/13 39/1 40/25
41/3 46/13 46/25
47/6 58/4 59/9
67/19 68/24
jail-house [2]
23/23 47/6
jails [1]  28/8
Jennifer [3]  5/7
72/19 73/1
job [3]  74/23
79/13 79/16
jobs [1]  74/24
join [1]  8/8
joint [1]  79/9
judge [32]  1/11
12/25 16/12 16/23
18/11 19/2 20/3
20/16 23/3 36/3
39/3 39/5 39/17
41/25 42/19 44/10
47/10 48/10 52/25
53/23 54/21 55/8
61/25 62/9 63/15
64/15 64/23 65/20
72/19 75/15 77/24
78/8
judges [3]  14/16
67/22 69/4
judgment [5]
78/14 79/15 81/19
82/8 82/20
judicial [7]  42/23
43/23 43/25 44/16
45/6 59/3 82/23
July 11th [5]  27/5
27/6 27/7 27/11
38/19
July 13th [5]
26/23 27/14 28/2
28/9 28/12
June 22nd [7]

21/2 34/20 34/23
35/3 35/15 48/18
50/1
June 24th [3]
34/14 34/16 35/22
juror [1]  45/25
justice [14]  5/16
42/15 42/21 43/3
43/7 44/10 44/21
45/9 45/23 46/7
47/17 51/24 54/10
79/22
justification [1]
65/7
justified [1]  63/2
justify [1]  44/5

**K**

K-I-M-B-E-R-L-Y
[1] 66/13
keys [2]  10/17
73/14
kids [5]  67/6
69/10 72/3 75/10
75/11
KIMBERLY [2]
66/9 66/13
knocked [2]  37/1
72/1
knowing [1]
72/11

**L**

lack [2]  51/17
55/18
lady [1]  10/16
language [3]
44/24 48/5 54/22
law [10]  11/1
49/12 51/6 52/19
62/6 63/24 64/7
64/12 64/14 71/24
laws [1]  79/5
leading [1]  30/6
leads [1]  63/24
learn [1]  68/19
learned [1]  69/12
learning [1]  44/3
led [1]  51/23
Lee [2]  25/19
25/20
lenient [4]  68/16
68/22 69/20 70/4

letter [79]  12/4
12/5 12/6 12/12
12/15 12/17 13/8
13/14 13/15 13/20
14/1 14/12 14/15
14/19 14/24 15/2
15/5 15/7 15/15
17/11 18/10 18/21
18/24 18/25 19/20
20/13 22/23 23/16
23/17 23/19 24/7
24/9 24/16 24/18
24/21 26/10 26/14
26/17 29/17 29/18
33/24 34/4 34/23
35/17 37/17 37/20
37/24 37/25 38/2
38/15 43/1 43/1
43/24 44/15 46/18
46/19 46/20 46/23
47/3 47/4 47/8
47/15 47/22 48/17
48/22 49/2 49/7
49/13 49/14 49/18
49/22 51/2 51/12
55/21 58/3 58/12
58/15 58/17 59/7
letter's [1]  15/13
letting [1]  73/12
levels [5]  43/10
55/4 55/14 56/4
61/21
lied [5]  22/11
25/12 25/24 26/5
51/10
life [11]  63/12
65/10 67/20 70/12
70/15 73/7 75/3
75/6 75/14 77/9
83/11
light [1]  74/1
list [1]  4/24
listen [1]  67/17
listening [3]
52/15 69/24 74/25
loaded [1]  62/19
location [2]  81/24
82/2
losing [1]  71/3
lower [2]  24/3
28/23
Lucie [16]  11/14
11/15 11/16 11/19

11/24 14/21 19/24
20/25 21/10 27/9
38/13 40/25 41/3
46/25 58/4 59/9
lunch [2]  62/17
73/9
lying [2]  49/21
51/8

**M**

mad [1]  68/2
man [12]  7/23
18/4 18/6 18/22
18/22 19/16 64/20
65/17 68/20 69/20
69/22 76/10
management [1]
65/14
mandatory [5]
61/7 61/11 77/20
80/18 81/9
manner [2]  79/6
81/12
married [1]  75/13
mask [1]  6/13
masked [1]  62/18
material [3]  44/8
58/22 79/25
materialized [1]
50/18
materially [4]
42/22 45/5 53/25
54/8
materials [1]  4/11
matter [8]  3/18
51/6 52/19 56/14
59/23 67/2 74/21
83/21
matters [2]  60/22
76/4
May 11th [5]
25/25 26/12 27/1
27/4 27/8
Mayo [2]  26/2
26/4
meeting [2]  8/6
21/20
memo [3]  44/5
72/1 81/24
memorandum [1]
70/10
men [2]  17/14
62/18

mental [1]  80/24
Mercer [1]  1/18
mercy [1]  70/5
mere [1]  54/10
merely [2]  47/14
48/6
message [1]
62/20
Miami [2]  80/8
80/8
mic [1]  5/21
MICHAEL [2]  1/14
3/7
microphone [1]
57/9
mid [1]  74/22
middle [1]  17/12
military [1]  75/12
miller [4]  1/24
1/25 83/22 83/23
minimize [1]  48/5
minimum [2]
49/13 79/17
mistaken [1]  78/9
mitigate [1]  49/5
mom [7]  11/21
15/25 16/1 16/7
21/3 47/18 47/20
momma [6]  67/3
68/24 69/9 69/11
69/23 70/1
Mommy [1]  41/12
monitor [1]  79/24
month [3]  50/3
60/8 74/18
monthly [1]  79/20
months [22]  50/3
60/8 60/10 61/8
62/1 62/2 64/17
64/25 66/17 71/8
71/17 73/7 74/18
74/21 78/16 78/18
78/20 78/22 78/23
78/24 79/1 81/7
months' [1]  61/7
mortgage [1]
74/15
mother [7]  5/1
40/22 58/5 59/13
65/25 71/19 77/10
mothers [1]  69/8
motor [1]  63/8
movement [1]

**M**

movement... [1] 52/12
Mr [19]  2/4 2/5 2/6 2/8 2/10 6/21 13/5 13/11 16/19 17/7 17/24 18/18 19/10 20/10 20/23 23/11 36/5 40/14 57/11
Mr. [134]
Mr. Green [2] 24/9 24/18
Mr. Mayo [1]  26/4
Mr. Porter [9] 4/17 6/4 36/2 39/12 42/7 61/16 72/15 82/24 83/5
Mr. Rodriguez [17]  3/12 4/11 4/24 5/13 5/20 16/25 23/6 36/6 38/11 42/1 42/10 48/13 55/17 60/12 60/23 61/14 65/23 63/25
Mr. Spivey [57] 3/13 3/21 7/25 8/6 8/9 8/12 23/13 23/17 23/19 24/11 26/9 26/12 26/13 26/16 26/19 27/18 27/21 28/2 28/17 29/1 29/10 30/19 31/21 31/25 32/16 32/19 32/25 33/6 33/23 34/1 34/5 38/2 49/7 49/12 50/4 52/16 53/10 57/2 57/8 57/12 57/19 58/11 58/12 58/14 58/16 59/1 59/21 63/6 63/12 64/6 64/25 65/10 75/1 75/22 76/10 77/5 83/10
Mr. Spivey's [4] 59/4 64/6 64/17 78/9
Mr. Vreeland [3] 3/17 59/24 78/19
Mr. Zamot [34] 4/22 6/22 9/13

11/6 12/19 13/6 14/1 16/11 16/20 17/8 18/19 19/11 20/24 21/12 23/4 23/12 28/15 36/6 37/17 39/8 49/14 49/20 50/2 51/12 51/19 51/22 52/3 53/2 53/4 58/3 58/17 58/18 59/6 59/12
Mr. Zamot's [7] 5/1 47/18 53/1 53/11 58/4 59/5 59/8
Ms. [6]  39/23 40/24 42/3 66/3 70/8 75/19
Ms. Flores [3] 39/23 40/24 42/3
Ms. Shiflet [1] 75/19
Ms. Willis [2] 66/3 70/8
multiple [2]  63/10 63/25
Myers [2]  8/22 10/24

**N**

Nathan [1]  3/15
nature [4]  50/25 52/13 62/5 62/8
necessary [2] 49/12 65/21
negate [1]  65/3
negotiate [1]  31/6
negotiated [1] 55/20
neighborhood [1] 36/16
neither [1]  58/21
nervous [1]  74/1
nice [1]  53/15
Nine [1]  73/7
Nine months [1] 73/7
nobody [4]  37/13 65/12 68/6 71/21
none [2]  4/14 50/13
North [1]  80/8
northern [1]

62/22
Nos [1]  17/3
note 4 [12]  43/17 43/20 45/3 45/12 45/18 45/19 45/21 46/5 47/11 47/12 48/1 54/4
notes 4 [1]  54/2
notice [1]  81/18
number [16]  13/1 14/16 17/18 18/1 18/12 18/20 19/3 19/12 20/4 20/12 20/17 37/18 44/12 58/15 82/17 82/22
Number 1 [2] 13/1 37/18
Number 2 [1] 17/18
number 28-2022CF00019 4 [1]  82/22
number 28-22CF000194 [1]  82/17
Number 3 [2] 18/1 18/12
Number 4 [2] 18/20 19/3
Number 5 [2] 19/12 20/4
Number 6 [2] 20/12 20/17
number one [1] 44/12
numerous [1] 51/8

**O**

oath [1]  57/1
obey [1]  64/13
object [2]  10/10 81/11
objection [19] 13/2 16/14 16/17 17/4 17/19 17/22 18/13 18/14 18/16 19/4 19/6 19/8 20/5 20/6 20/8 20/18 20/19 20/21 81/14
objections [8]  4/8 4/9 5/12 5/14 44/7

54/16 60/13 81/15
objections under [1]  44/7
obligations [3] 79/14 79/18 80/5
obstruct [3]  43/7 45/8 46/8
obstructed [1] 43/6
obstruction [25] 5/16 6/3 27/18 42/15 42/20 43/3 44/6 44/9 44/21 44/25 44/25 45/23 47/17 48/7 51/23 53/23 54/10 55/2 55/3 55/12 58/1 58/6 59/15 79/2 81/14
obstructive [2] 59/20 79/4
occasions [1] 51/8
October 6 [2] 30/14 31/9
offender [1] 71/24
offenders [1] 71/25
offense [17]  5/7 26/5 39/15 43/9 45/16 48/9 57/13 58/13 60/3 60/6 60/6 61/5 62/5 62/9 62/9 63/9 63/15
offenses [3]  4/5 57/20 77/8
office [10]  1/14 25/9 25/15 27/15 62/23 73/11 79/23 79/24 80/7 80/15
official [5]  1/24 43/22 43/22 59/3 83/23
oh [2]  39/19 69/16
older [1]  67/17
one's [1]  65/8
open [3]  10/15 73/10 73/11
opinion [1]  42/24
opportunity [3]

5/10 66/16 73/5
opposition [1] 42/11
order [4]  45/9 53/4 73/21 79/18
originate [1]  53/6
overall [1]  60/9
overcome [2] 75/5 75/9

**P**

P-R-O-C-E-E-D-I-N-G-S [1]  2/18
P.A [1]  69/3
page [3]  2/2 13/8 13/14
Pages [1]  1/7
Palm [13]  1/19 11/8 11/9 11/17 11/20 26/24 27/5 27/7 27/11 27/15 28/13 28/20 39/1
panic [1]  73/22
pantry [1]  69/12
papers [2]  19/19 19/20
paragraph [10] 5/17 5/18 5/23 6/1 42/15 60/4 60/5 78/9 78/11 82/13
paragraph 10 [1] 82/13
paragraph 11 [1] 78/9
paragraph 32 [3] 5/18 5/23 42/15
paragraph 34 [1] 60/4
paragraph 36 [2] 6/1 60/5
parent [5]  66/25 67/6 69/11 70/5 71/22
parents [1]  68/23
Park [1]  14/10
part [4]  7/17 59/6 66/18 81/3
part F [1]  81/3
participated [1] 30/10
parties [3]  59/22 61/23 77/16
parties' [1]  57/24

**P**

passenger [1] 11/3
path [3] 45/1 45/19 47/13
pattern [1] 76/21
pauperis [1] 81/21
pause [2] 13/24 39/4
pay [9] 77/19 77/20 79/8 79/13 79/17 79/20 80/1 81/4 81/19
payable [1] 80/6
payment [5] 74/9 74/15 79/11 79/21 79/24
payments [1] 80/2
people [12] 14/10 22/13 33/8 67/5 67/6 68/20 70/17 70/20 75/7 75/7 76/24 77/1
perfect [1] 69/22
perhaps [2] 64/21 71/9
period [3] 71/10 79/11 80/11
perjury [7] 30/24 31/1 31/4 31/7 45/14 45/16 50/18
permissible [1] 81/1
permission [4] 12/25 13/4 16/23 17/6
permitted [1] 75/22
person [7] 31/13 31/16 31/20 46/20 70/25 71/11 80/15
persons [3] 32/19 70/15 71/1
persuaded [1] 59/20
phone [13] 10/17 41/2 41/5 41/7 41/16 69/25 72/20 72/21 73/14 74/11 74/12 74/13 74/13

phonetic [1] 69/2
photograph [6] 17/8 18/2 18/20 18/24 19/12 20/12
photographs [6] 16/21 19/23 46/25 48/20 48/21 58/3
pick [1] 8/22
picked [1] 27/14
picture [2] 51/4 76/15
pictures [1] 23/15
piece [1] 51/4
PIERCE [5] 1/6 1/16 11/13 27/1 83/25
place [4] 8/3 53/4 59/8 62/11
Plaintiff [2] 1/4 1/14
plan [1] 4/17
play [4] 33/12 33/17 53/15 58/12
played [1] 58/13
plays [1] 52/17
plea [31] 4/10 7/14 7/17 29/2 29/4 29/8 29/11 34/1 34/3 35/22 50/3 50/4 54/22 54/23 54/24 55/20 56/3 56/13 56/15 56/18 59/4 59/5 59/8 59/21 71/15 78/6 78/8 78/9 78/10 78/11 82/13
plead [3] 34/9 44/11 55/9
pleading [1] 55/15
pled [11] 3/21 7/13 29/6 29/7 34/4 34/6 34/7 34/12 34/16 34/25 44/1
point [17] 6/4 23/4 26/10 26/22 28/9 32/15 33/5 34/10 34/16 42/17 44/11 54/20 55/5 60/16 64/24 71/2 82/24
points [1] 55/7

police [2] 74/12 75/13
PORTER [26] 1/14 2/4 2/6 2/8 3/7 4/17 6/4 6/21 13/5 13/11 16/19 17/7 17/24 18/18 19/10 20/10 20/23 36/2 36/5 39/12 40/14 42/7 61/16 72/15 82/24 83/5
position [6] 51/11 53/5 53/5 53/14 53/21 70/11
possessing [2] 80/20 80/21
possession [1] 83/7
potential [2] 46/2 50/11
potentially [1] 44/16
pray [1] 77/11
prayed [1] 68/1
Precisely [1] 48/10
preclude [1] 80/2
prepared [1] 77/23
preponderance [2] 48/3 59/1
present [6] 5/4 40/17 42/8 49/17 59/23 65/25
presentation [2] 4/18 59/10
presentence [3] 4/7 77/16 81/3
preserve [1] 60/12
prevent [1] 29/13
primary [1] 51/17
prison [17] 63/19 63/21 63/23 64/2 64/25 65/18 67/19 68/10 68/17 68/19 68/23 69/18 70/17 71/9 71/23 72/2 79/13
Prisons [2] 78/16 79/23
probation [6] 3/14 3/16 56/7

79/23 80/15 83/2
problem [1] 48/15
proceed [2] 54/14 73/3
proceeded [1] 31/17
proceeding [6] 42/23 43/23 44/1 44/16 45/6 59/3
proceedings [6] 13/24 39/4 76/6 78/2 83/17 83/20
process [1] 49/24
produce [3] 43/21 50/17 59/2
produces [1] 61/6
producing [2] 43/20 50/16
product [1] 65/3
proffer [1] 4/10
profound [1] 64/4
program [2] 69/8 81/25
programs [1] 72/1
prohibited [1] 80/20
promise [1] 70/1
promises [1] 7/20
promote [1] 62/6
pronounced [1] 81/12
properly [3] 55/12 57/9 74/14
property [2] 29/19 76/25
proposition [1] 47/14
prosecution [3] 39/15 43/8 48/9
prosecutors [2] 67/22 69/4
protect [1] 64/8
proven [1] 51/6
provision [1] 58/24
provisions [1] 57/25
PSI [7] 4/10 5/11 5/14 42/16 60/23 61/20 76/22
public [1] 64/9
pull [1] 73/20

pulled [1] 10/15
punch [2] 32/6 32/8
punched [1] 33/3
purchase [1] 74/13
purporting [1] 43/24
pursued [2] 11/1 63/12

**Q**

quarter [1] 79/17
question [5] 35/8 35/13 48/17 56/15 76/19
questions [9] 13/21 23/3 23/13 35/3 36/7 38/11 38/12 39/6 42/2
quick [1] 39/20
quote [2] 48/8 56/11

**R**

raise [4] 6/14 40/3 57/3 66/8
raised [3] 66/20 67/3 75/7
range [11] 60/1 60/7 60/9 60/14 60/16 61/6 61/8 61/19 63/1 63/4 64/17
rate [1] 79/20
RDAP [2] 81/25 82/10
reached [1] 38/25
ready [3] 12/8 68/13 68/15
recess [4] 76/3 76/4 76/6 83/14
recidivism [1] 64/7
recognize [5] 12/21 13/6 16/22 17/8 19/12
recommendation [9] 54/18 55/22 71/14 71/14 71/15 81/25 82/6 82/9 82/11
recommendations [2] 81/24 82/8

**R**

recommended [2] 61/10 61/11
record [16] 3/21 4/6 6/17 40/7 43/22 50/17 56/9 56/22 58/7 59/2 59/14 61/4 66/12 76/12 78/25 82/20
red [1] 74/1
Redirect [2] 2/6 36/4
reduction [3] 54/18 59/18 60/5
references [1] 58/15
reflects [1] 3/21
region [1] 62/22
relation [1] 4/1
release [10] 61/8 71/6 71/10 79/19 80/10 80/11 80/14 80/17 80/19 81/8 81/9
released [4] 53/10 63/16 77/2 80/16
rely [1] 77/12
remain [2] 6/12 75/25
remaining [1] 5/12
remove [1] 6/12
renew [1] 81/13
rental [1] 74/10
repaired [4] 74/7 74/17 74/17 74/19
repeated [2] 64/7 76/21
report [6] 4/8 4/8 77/16 79/25 80/15 81/3
Reporter [2] 1/24 83/23
reports [1] 49/21
request [1] 82/19
required [3] 49/11 49/16 75/23
requirement [9] 42/22 53/25 53/25 54/3 54/5 54/8 56/25 80/25 81/1
requirements [1]

64/14
residences [2] 59/13 63/10
resources [1] 59/22
respectfully [1] 13/17
response [6] 4/9 44/7 45/11 47/13 52/24 53/22
responsibility [8] 5/25 29/14 56/7 57/13 57/19 59/18 61/22 76/1
restaurant [1] 73/19
restitution [13] 61/11 77/20 77/23 78/6 78/12 79/9 79/20 79/25 80/4 80/6 80/8 81/2 81/9
restriction [1] 80/24
result [4] 50/19 54/25 71/3 77/7
resumed [1] 76/7
return [1] 42/4
rise [2] 76/5 83/16
RMR [2] 1/24 83/23
road [3] 69/9 75/6 75/8
rob [1] 65/6
robbed [1] 62/10
robbery [3] 30/10 30/12 36/9
robs [1] 63/23
RODRIGUEZ [23] 1/18 2/5 2/10 3/11 3/12 4/11 4/24 5/13 5/20 16/25 23/6 23/11 36/6 38/11 42/1 42/10 48/13 55/17 57/11 60/12 60/23 61/14 65/23
role [1] 58/13
room [6] 31/22 32/1 32/12 33/22 52/17 69/5
ruin [1] 75/3

ruining [1] 74/23
rule [1] 54/15
ruling [2] 59/24 60/14
rulings [1] 60/17

**S**

S-H-I-F-L-E-T [1] 73/2
sake [2] 77/6 77/6
sat [6] 21/17 22/3 22/8 24/15 72/2 73/22
satisfied [2] 59/7 59/10
satisfy [3] 59/1 59/11 80/4
saved [1] 59/22
scare [1] 9/4
scared [11] 22/20 28/3 28/7 28/20 28/21 41/9 41/20 41/22 47/20 51/11 68/12
scenario [2] 44/7 55/11
schedule [1] 79/22
score [1] 74/22
screen [1] 12/22
search [1] 81/1
seat [6] 6/16 11/3 40/6 57/7 73/13 75/8
second [5] 13/14 36/3 39/3 56/20 77/25
seconds [2] 31/14 31/18
section [7] 3/24 3/25 4/3 4/4 42/16 56/13 77/18
Section 2 [2] 3/25 4/4
Section 2119 [1] 3/24
Section 3553 [1] 77/18
Section 3C1.1 [1] 42/16
Section 924 [1] 4/3
sees [1] 53/6

selfish [1] 73/15
sense [2] 12/9 52/14
sentence [32] 24/3 28/23 49/5 61/8 61/23 62/1 62/2 63/1 63/4 63/18 64/2 64/10 64/16 71/5 71/7 71/7 71/24 72/10 72/12 77/14 78/17 78/23 79/1 79/7 80/12 81/7 81/10 81/12 81/17 82/16 82/21 82/21
sentences [1] 72/7
separation [1] 53/4
September 20th [1] 30/2
serious [6] 62/9 63/20 72/8 76/21 77/3 77/4
seriously [2] 71/18 72/9
serve [1] 49/2
served [3] 64/10 78/24 80/13
serves [1] 71/6
serving [2] 63/17 64/2
session [1] 21/18
seven [1] 74/23
seven years [1] 74/23
severing [1] 71/24
severity [1] 62/15
shall [11] 79/8 79/11 79/19 79/24 80/6 80/10 80/14 80/17 80/23 81/4 82/21
sheriff's [3] 25/9 25/15 25/20
Shiflet [4] 5/7 72/19 73/1 75/19
shoes [2] 53/11 62/17
shoot [4] 9/22 10/1 62/19 73/15
short [2] 72/7

76/19
short-term [1] 72/7
shot [2] 9/13 9/17
shower [1] 8/17
shown [1] 23/15
Shriver [1] 49/17
sic [3] 28/15 67/11 68/22
side [1] 74/24
sincerely [1] 70/24
single [2] 67/6 69/11
situation [3] 53/12 68/1 69/7
Sixteen [1] 9/25
sleeping [1] 33/9
smoking [1] 8/19
society [1] 64/14
somebody's [1] 37/12
son [17] 40/20 40/24 66/17 66/24 67/10 67/10 67/12 67/15 67/20 67/23 68/7 68/18 68/19 69/14 69/25 71/20 75/12
son's [1] 41/19
soon [1] 41/12
sorts [1] 49/1
sound [1] 34/14
South [2] 1/15 83/24
SOUTHERN [2] 1/1 62/23
speaker [1] 37/5
special [6] 26/2 61/12 80/24 81/2 81/5 81/9
specific [5] 35/5 62/7 64/5 64/6 82/8
speed [1] 63/25
spell [4] 6/17 40/7 66/12 72/25
spends [1] 63/21
spent [2] 64/12 65/17
SPIVEY [124]
Spivey's [8] 12/12 31/13 31/17 44/20

**S**

Spivey's... [4]  59/4 64/6 64/17 78/9
spotted [1]  10/14
springs [1]  64/24
squarely [1]  46/5
St. [16]  11/14 11/15 11/16 11/19 11/24 14/21 19/24 20/25 21/10 27/9 38/13 40/25 41/3 46/25 58/4 59/9
St. Lucie [16]  11/14 11/15 11/16 11/19 11/24 14/21 19/24 20/25 21/10 27/9 38/13 40/25 41/3 46/25 58/4 59/9
stage [1]  42/19
stand [11]  6/11 39/24 47/14 51/2 51/19 54/24 55/6 62/4 62/24 66/1 67/12
standard [2]  59/1 80/18
standing [9]  6/12 10/20 17/14 17/14 18/3 19/16 40/2 54/17 73/13
stands [1]  66/4
starting [3]  3/6 42/17 61/23
state [10]  3/5 6/17 34/22 40/7 61/3 66/11 71/24 72/4 72/5 82/16
stated [1]  82/22
statement [6]  15/13 44/8 44/20 56/7 75/23 76/1
statements [2]  14/1 77/15
STATES [47]  1/1 1/3 1/11 3/4 3/8 3/23 3/24 4/2 4/3 4/19 6/9 7/14 7/18 12/24 16/12 17/17 18/11 19/2 20/3 20/16 39/5 39/22

42/21 42/24 45/10 46/12 47/24 49/17 50/6 53/9 53/24 54/7 54/9 54/25 55/4 55/9 61/25 62/23 63/3 63/15 64/15 72/16 77/18 80/7 81/5 83/7 83/24
States v [3]  3/4 49/17 50/6
States v. Taylor [1]  45/10
stationary [1]  73/19
status [1]  7/11
statutory [1]  77/17
stay [2]  40/2 68/14
stays [1]  60/4
steal [2]  8/23 65/7
stealing [5]  63/21 63/21 67/1 67/3 70/17
steals [1]  63/23
stipulation [1]  78/5
stole [3]  10/23 63/10 63/11
stood [1]  33/22
store [1]  67/3
story [3]  28/15 28/19 69/7
strong [2]  56/16 62/20
struggles [1]  75/8
struggling [1]  74/3
submit [3]  45/21 55/11 76/24
submits [6]  47/24 48/2 53/24 54/9 63/3 64/15
submitted [2]  13/17 70/9
suborn [3]  45/14 45/15 50/17
suborns [1]  45/13
subsection [1]  3/24
substance [3]  80/21 80/25 82/1

substantial [1]  59/22
successful [1]  45/8
sufficient [6]  43/2 44/9 46/16 47/16 54/11 58/25
suggestion [1]  52/7
suggests [1]  64/7
Suite [2]  1/15 1/19
summarizing [1]  39/16
sun [1]  73/12
supervised [8]  61/8 71/6 71/10 71/12 80/11 80/17 80/18 81/8
supervision [1]  72/11
support [10]  6/8 39/13 42/8 43/3 47/10 47/16 54/18 55/13 58/1 58/5
supports [1]  59/15
surgery [1]  10/5
survive [3]  67/8 69/12 69/13
swear [1]  57/2
sworn [6]  6/12 6/15 40/2 40/4 57/5 66/9
system [8]  29/18 51/22 52/3 52/5 52/10 52/11 72/4 72/8

**T**

table [2]  19/19 47/2
taught [1]  75/10
Taylor [1]  45/10
teach [2]  67/25 68/7
teaching [2]  67/25 70/16
telltale [1]  51/25
temporary [1]  74/11
ten years [1]  68/14

Tenth [1]  82/23
term [3]  60/9 72/7 72/12
terrifying [1]  62/20
testimony [14]  46/4 46/11 46/23 47/9 47/19 50/8 51/18 52/15 58/1 58/4 58/8 58/11 58/13 58/16
text [1]  43/14
Thank [38]  3/2 5/9 5/22 23/5 23/7 36/1 39/7 39/8 41/24 42/3 42/5 48/12 52/22 54/13 55/16 57/6 57/8 57/22 57/23 60/11 65/22 66/6 66/15 70/6 70/7 70/8 72/13 72/14 73/4 73/5 75/18 75/19 76/2 76/8 81/16 82/12 83/3 83/15
that he [1]  52/20
theft [2]  63/7 63/8
thinking [1]  70/18
thought [2]  69/4 70/25
threat [1]  47/21
threaten [1]  46/17
threatened [11]  10/22 12/7 14/5 14/6 15/14 24/2 28/24 46/9 49/5 52/12 59/12
threatening [3]  45/24 73/14 76/24
threatens [1]  62/19
threats [1]  22/25
three days [1]  21/11
three weeks [1]  63/22
three years [3]  80/11 80/12 81/8
threw [2]  32/6 32/8
thug [1]  75/2
tied [1]  22/14
time [39]  3/19 5/8

12/19 12/24 16/12 16/20 17/17 19/2 19/11 20/3 20/16 21/12 21/21 21/25 22/3 22/8 26/15 27/17 29/7 35/6 35/7 54/24 55/19 55/20 58/7 69/3 69/19 71/8 71/20 71/23 73/17 74/23 75/2 75/15 75/16 75/16 76/20 77/23 79/21
times [5]  10/1 10/2 66/25 67/19 68/25
Title [5]  3/23 3/24 4/2 4/3 77/17
Title 18 [5]  3/23 3/24 4/2 4/3 77/17
today's [3]  4/7 4/12 50/8
tolerated [1]  44/23
total [8]  60/5 60/6 61/5 62/1 74/6 78/16 81/6 81/7
tough [1]  65/5
toward [2]  79/14 79/17
towards [1]  36/15
trailing [1]  5/20
TRANSCRIPT [1]  1/10
transcription [1]  83/20
transfer [1]  59/8
transferred [2]  11/16 11/19
transported [6]  26/23 27/7 27/11 38/19 38/20 39/1
trap [1]  12/8
trauma [1]  76/25
treatment [2]  80/25 80/25
trial [9]  44/4 44/13 44/17 44/20 55/10 55/15 55/25 56/2 59/23
trouble [2]  41/5 70/3
troubled [1]

**T**

**troubled... [1]**
59/19
**troubling [1]**
63/14
**Trunc [1]** 69/2
**truth [10]** 21/21
21/23 22/9 22/21
22/23 22/25 25/3
30/1 30/23 31/2
**truthful [2]** 30/8
58/10
**two days [2]**
49/25 50/1
**two months [1]**
50/3
**two-level [6]** 5/18
5/19 5/24 54/18
59/18 60/5

**U**

**U.S [2]** 1/14 83/24
**U.S. [4]** 3/16
79/23 79/23 79/24
**U.S. Attorney's**
**[1]** 79/24
**U.S. Bureau [1]**
79/23
**U.S. Probation [2]**
3/16 79/23
**U.S.S.G. [1]** 5/24
**U.S.S.G. 3C1.1 [1]**
5/24
**uh [2]** 35/21
35/21
**Uh-uh [1]** 35/21
**ultimate [1]** 59/25
**ultimately [7]**
10/25 12/15 55/7
55/14 58/10 58/18
64/1
**unable [1]** 81/19
**Unbeknownst [1]**
74/2
**unbelievable [1]**
70/13
**undated [1]** 51/4
**underscores [1]**
64/8
**understanding [1]**
50/23
**understate [1]**
62/15

**understatement**
**[1]** 63/13
**unexpected [1]**
80/3
**unfortunately [2]**
76/14 77/13
**UNICOR [1]** 79/16
**unit [1]** 35/1
**UNITED [47]** 1/1
1/3 1/11 3/4 3/8
3/23 3/24 4/2 4/3
4/19 6/9 7/14 7/18
12/24 16/12 17/17
18/11 19/2 20/3
20/16 39/5 39/22
42/21 42/24 45/10
46/12 47/24 49/16
50/6 53/9 53/24
54/7 54/9 54/25
55/4 55/9 61/25
62/23 63/3 63/14
64/15 72/16 77/18
80/7 81/5 83/7
83/24
**unlawful [1]**
43/10
**unlawfully [3]**
45/24 50/15 80/21
**unless [1]** 74/6
**unpaid [1]** 81/2
**unresolved [1]**
5/13
**untenable [3]**
53/5 53/14 53/21
**untruthful [4]**
30/16 30/18 46/12
48/25
**upbringing [4]**
64/20 65/5 65/8
66/17
**us [24]** 1/15 8/6
8/12 8/20 9/8 9/15
12/1 12/9 14/22
17/10 18/1 18/20
19/14 20/12 23/22
32/15 32/22 36/9
36/14 43/18 51/4
59/25 65/2 72/25

**V**

**v. [1]** 45/10
**VALENTIN [2]**
1/18 3/10

**value [3]** 46/18
55/11 55/13
**vehicle [13]** 10/15
10/25 11/4 63/8
63/11 64/1 71/3
71/4 73/10 74/5
74/6 74/16 74/17
**victim [9]** 5/6
56/2 57/14 62/12
65/4 70/22 72/17
72/19 80/9
**victim's [1]** 62/17
**victimize [1]** 77/7
**victims [2]** 5/4
68/5
**violate [1]** 64/11
**violation [2]** 3/23
4/2
**violence [1]** 4/2
**virtue [1]** 49/18
**visit [1]** 15/23
**voice [1]** 41/19
**Vreeland [4]** 3/16
3/17 59/24 78/19
**vs [2]** 1/5 82/17

**W**

**W-I-L-L-I-S [1]**
66/14
**wages [2]** 79/12
79/14
**walk [3]** 6/11 8/15
10/14
**walked [1]** 10/15
**walking [4]** 8/19
19/16 20/14 36/15
**warm [1]** 73/12
**warrant [2]** 44/9
54/11
**warranted [4]**
47/25 55/5 62/3
65/21
**warrants [1]**
39/14
**watched [1]**
70/23
**weaken [1]** 48/5
**weighed [1]**
57/25
**welfare [1]** 67/7
**West [3]** 1/19
26/24 27/15
**West Palm [2]**

26/24 27/15
**whatsoever [1]**
49/19
**white [1]** 10/14
**willfully [1]** 43/6
**Williams [1]** 50/6
**Willis [5]** 66/3
66/9 66/13 66/14
70/8
**window [2]** 37/2
37/16
**wish [4]** 5/5 6/4
75/23 83/12
**wishes [1]** 54/19
**withhold [1]** 55/4
**witnesses [2]** 2/1
56/1
**woman [2]** 62/10
63/23
**wondering [1]**
56/16
**worst [1]** 73/8
**wrestled [1]** 33/3

**Y**

**young [7]** 64/20
65/17 66/21 69/19
70/25 76/10 76/20
**youthful [2]** 71/24
71/25

**Z**

**Z-A-M-O-T [1]**
6/19
**Zamot [62]** 2/3
4/20 4/22 6/9 6/15
6/19 6/22 9/13
11/6 12/19 13/6
13/18 14/1 16/11
16/20 17/8 18/19
19/11 20/24 21/12
23/4 23/12 28/15
36/6 37/17 39/8
40/22 42/25 43/1
44/3 44/12 44/15
44/17 44/19 45/15
46/2 46/4 46/10
46/11 46/17 46/19
47/1 47/2 47/5
47/6 47/7 49/14
49/20 50/2 51/12
51/19 51/22 52/3
52/2 53/4 58/3

58/17 58/18 59/6
59/12 62/10 79/9
**Zamot's [9]** 5/1
46/23 47/9 47/18
53/1 53/11 58/4
59/5 59/8